## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANNE BUEHLER, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>      v.<br><br>JETBLUE AIRWAYS CORPORATION and AMERICAN AIRLINES GROUP INC.,<br><br>              Defendants. | Civil Action No.<br><br>CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES ........................................................................................................... 5

III.    JURISDICTION AND VENUE ......................................................................... 6

IV.     FACTUAL BACKGROUND ............................................................................. 7

   A.   Airline Industry Background ............................................................................ 7

      1.   An airline's presence in the market, and its ability to compete, is limited by a
           number of constraints ............................................................................................ 7

      2.   There are four categories of domestic airlines. ................................................. 8

   B.   The domestic commercial airfare market is highly concentrated, with three
        legacy carriers dominating the field. ................................................................ 10

      1.   American, in particular, has championed consolidation to drive up its market
           share. ................................................................................................................ 11

      2.   There are high barriers to entry in the domestic commercial airline industry ... 14

      3.   Low-cost and hybrid carriers are essential forces in keeping scheduled
           commercial air travel affordable for purchasers and passengers. ...................... 14

   C.   Until 2020, JetBlue was a bulwark against the effects of consolidation on the
        domestic airfare market. ................................................................................. 15

   D.   JetBlue and other low-cost carriers constituted an existential threat to legacy
        airlines' business models ................................................................................ 17

   E.   JetBlue and American formed a "Northeast Alliance," which constrains
        competition and raises airfare prices across the country. ................................ 18

      1.   American conceived the idea for the Northeast Alliance in 2019. ................... 19

      2.   In July 2020, American and JetBlue entered into the Northeast Alliance. ........ 19

      3.   JetBlue and American announced the Northeast Alliance in July 2020,
           claiming it was beneficial for purchasers; but the DOT, DOJ, and
           competitors disagreed. ...................................................................................... 25

   F.   The Northeast Alliance restricts the available flights into and out of the
        Northeast, and raises airfare prices across the region. ...................................... 33

      1.   Prior to the Northeast Alliance, JetBlue and American fiercely competed
           head-to-head in the Northeast. ........................................................................... 34

      2.   The Northeast Alliance restricts available flights. ............................................ 39

      3.   The Northeast Alliance allows JetBlue and American to maintain and/or raise
           airfare prices across the region .......................................................................... 41

      4.   The Northeast Alliance combines JetBlue's and American's market share ...... 43

      5.   The Northeast Alliance gives American control once more over assets the
           DOJ forced it to divest in order to preserve competition ................................... 47

i

V.      MARKET POWER AND MARKET DEFINITION ............................................. 49

VI.     ANTICOMPETITIVE EFFECTS ........................................................................ 53

   A.   Before the Northeast Alliance, the defendants had significant market power
        at Boston Logan, JFK, LaGuardia, and Newark. ................................................. 54

      1.   Boston Logan ...................................................................................................... 54

      2.   New York City .................................................................................................... 55

   B.   Before the Northeast Alliance, American and JetBlue were ramping up
        competition at Boston Logan, JFK, LaGuardia, and Newark. ........................... 56

   C.   After the Northeast Alliance, JetBlue and American eliminated competition,
        leveraging their combined market power to raise prices.................................... 58

VII.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE........ 63

VIII.   CLASS ACTION ALLEGATIONS .................................................................... 65

IX.     CAUSES OF ACTION ....................................................................................... 71

X.      PRAYER FOR RELIEF ...................................................................................... 78

XI.     JURY TRIAL DEMAND .................................................................................... 80

## I.    INTRODUCTION

1.      The market for plane flights in the United States—especially in the Northeast—is a severely consolidated and resource-constrained market. There are relatively few serious competitors in the market. And there are high barriers to entry: there is only so much space at airports for planes to board or deplane customers at gates; there is only so much space in the sky for plane traffic; and there is only so much time in the day to subdivide into departure and arrival reservations, called slots, for arriving and departing planes.

2.      These resource constraints make it difficult, if not nearly impossible, for new competitors to enter the market and increase competition. Rigorous competition among the existing airlines is therefore essential to keeping air travel affordable and avoiding anticompetitive harm to vacationers and business travelers alike.

3.      Three legacy airlines (American Airlines (American), United Airlines (United), and Delta Air Lines (Delta)) with extensive nationwide and international networks largely dominate the market—and have for decades. Occasionally, they face competition from low-cost carriers like Southwest Airlines (Southwest). Low-cost carriers operate on different business models, with more limited networks than the legacy airlines, and often offer lower fares because of their more streamlined service.

4.      In 1998, JetBlue Airways (JetBlue) arrived. From its founding, JetBlue was a thorn in the side of the legacy airlines. It competed aggressively on price, offering lower fares than the legacy carriers and forcing those companies to lower their prices to remain competitive. It was so effective, in part, because it focused on providing a high quality of service—a perk that other low-cost carriers had subordinated to low fares—such as more leg room, in-flight Wi-Fi, and its own version of business class, called Mint. When JetBlue

1

began flying on a specific route, such as the route between Boston and Washington, D.C., prices for airfare on that route plummeted across the industry in response to the low-cost competitor. When JetBlue stopped flying a route, legacy carriers raised their prices, unchecked by low-priced competition.

5.      JetBlue was a disruptor in the industry—such an effective disruptor that academics have given, and the industry has adopted, a name for its ability to constrain prices and restore competition: the "JetBlue Effect." The JetBlue Effect has enabled JetBlue to grow to the sixth largest airline in the industry, as measured by revenue.

6.      Even American, the largest airline in the world, had its bottom line threatened by JetBlue's presence in the industry. When American tried to raise prices, JetBlue refused to follow suit, causing American to abandon its efforts. When American tried to decrease capacity (meaning reducing the number of passengers it carried to drive up demand and support price increases), JetBlue provided more capacity and thwarted American's plans. JetBlue competed rigorously with American, and sometimes outcompeted the behemoth. This forced American to respond in kind, competing with JetBlue. The result: lower and lower fares, more choices, and better service for customers.

7.      Nowhere was the competition between American and JetBlue more fierce than in the Northeast. The Northeastern United States is one of the most resource-constrained regions in the country. Two of the three slot-controlled airports in the country are in New York City at John F. Kennedy International Airport (JFK) and LaGuardia Airport (LaGuardia). The third New York City-region airport, Newark Liberty International Airport (Newark), operates under strict constraints on air traffic above the airport, which limit the number of planes that can arrive and depart there. And Boston's

airport, Boston Logan International Airport (Boston Logan), has very few gates available for airlines to use. The competition between American and JetBlue promised, and for a time delivered, meaningful savings to passengers traveling to, from, or through these four airports—the predominant airports in the Northeast.

8.      But it was a threat to American's bottom line. Because of the JetBlue Effect, American could not maintain large profit margins by reducing capacity, under-utilizing its slots and gates, or raising prices.

9.      In 2019, when American was laboring under the JetBlue Effect and anticipating more and more extreme competition from JetBlue, its executives had an idea: instead of competing, JetBlue and American should collaborate. Collaboration would remove JetBlue as a competitor, freeing not only American but also JetBlue to raise prices, restrict capacity, and bilk purchasers for scheduled commercial air passenger service.

10.      From this idea arose the Northeast Alliance: a series of agreements between American and JetBlue in which American and JetBlue promised to collude, not compete. The agreements bind the companies to coordinate their flight offerings and jointly decide which company would fly which route, using which plane, at what time—in other words, to allocate the supply of flight offerings between them, artificially limiting the capacity available to purchasers. They agreed not to sell or lease any of their assets (slots or gates) to other competitors, and to rearrange who controlled which slots to maximize their collective ability to coordinate their schedules to support price increases. To cement the collaboration contemplated by the Northeast Alliance, American and JetBlue agreed to pool and split their excess revenue from the Alliance—which disincentivized competition

between the two airlines, and incentivized them to raise prices, and allow their former competitor to raise theirs, so that both would benefit.

11.     American and JetBlue have reaped rich rewards since the companies began implementing the Northeast Alliance in January or February 2021. American is free to raise prices in the Northeast without fear of competition from its now-collaborator, JetBlue. JetBlue is free to raise prices without fear of competition from one of the most powerful market participants, American. Under the Northeast Alliance, the companies restricted the available ticket offerings and charged more than they could if they had to compete with one another. The Northeast Alliance is a win-win for JetBlue and American.

12.     But purchasers have lost. The Northeast Alliance has caused passengers and purchasers to bear increased costs for the same, or worse, service, that was more affordable before American and JetBlue agreed to collude. Purchaser savings from the JetBlue Effect, which JetBlue had estimated to exceed $10 billion (including $3 billion at Boston Logan alone) since its founding, vanished. And the fare-increasing effects of American and JetBlue's Northeast Alliance have trickled through the industry, raising fares on all airlines.

13.     This sort of horizontal market allocation, where two competitors agree not to compete for customers in order to preserve or enhance their own profits, is precisely the sort of anticompetitive arrangement that is condemned as *per se* illegal. The United States Department of Justice (DOJ), the United States Department of Transportation (DOT), and several states' attorneys general have all recognized that the defendants' conduct was illegal.

14.     As a result of this illegal arrangement, purchasers have been forced to pay more for scheduled commercial air service into, through, or out of the Northeast than they

would have paid if American and JetBlue had not formed the Northeast Alliance. These increased fares represent a classic form of antitrust injury: overcharges.

15.    This lawsuit seeks monetary relief for victims of American and JetBlue's misconduct. It seeks to hold American and JetBlue liable for violating the federal antitrust laws. The Northeast Alliance represents a contract, combination, and conspiracy to acquire, maintain, and leverage unearned market power in the market for scheduled commercial air passenger service in the Northeast. And after acquiring that power, American and JetBlue restricted supply by splitting the market between themselves, and raised prices. As a result, purchasers have been overcharged for commercial air passenger service since the Northeast Alliance's inception.

16.    American and JetBlue should not be allowed to retain their ill-gotten gains. The DOJ and state attorneys general have sought to end the defendants' anticompetitive practices; the time to remedy the harm already wrought on purchasers is now.

## II.    PARTIES

17.    The plaintiff, Dianne Buehler, resides in Massachusetts and purchased airfare from JetBlue in 2022. Ms. Buehler initially booked travel on JetBlue for herself, her husband, and her daughter for a trip from Boston Logan to Savannah/Hilton Head International Airport in February 2022. The Buehler family had to postpone the trip as originally scheduled, but rebooked the trip, using credits from the original booking, later that year.

18.    The defendant American Airlines Group Inc. is an airline incorporated in Delaware, with its headquarters in Fort Worth, Texas. It operates hubs in Charlotte, NC; Dallas/FortWorth, TX; Los Angeles, CA; Miami, FL; New York City, NY; Philadelphia, PA; Phoenix, AZ; and Washington, D.C. Founded in 1926, American is today the largest

airline not just in the United States, but in the world. It flies more available seat miles (ASMs), offers more seats, and serves more locations in the United States than any other airline. In 2019, American flew approximately 215 million passengers to more than 365 locations worldwide, bringing in roughly $45 billion in revenue.

19.     The defendant JetBlue Airways Corporation, is an airline incorporated in Delaware and headquartered in Long Island City, New York. Founded in 1998, it is the sixth-largest airline in the United States, and operates in six focus cities: New York, NY; Boston, MA; Fort Lauderdale/Hollywood, FL; Orlando, FL; Los Angeles, CA; and San Juan, PR. JetBlue is the largest carrier at Boston Logan. In 2019, JetBlue flew approximately 42 million passengers to more than 100 locations, earning approximately $8 billion in revenue.

### III.     JURISDICTION AND VENUE

20.     This action arises under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Ms. Buehler seeks damages for her injuries, and those suffered by members of the Class, as defined below, resulting from the defendants' anticompetitive conduct that has raised the prices of airfare, not just for their own customers, but for all air travelers nationwide. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (diversity due to a qualifying class action) and 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust).

21.     The defendants transact business within this district, and they transact their affairs and carry out interstate trade and commerce, in substantial part, in this district and/or have an agent and/or can be found in this district. Venue is appropriate within this district under section 12 of the Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters). The appropriateness of this venue is confirmed by the fact that both defendants

are currently litigating a related case in this district, *United States v. American Airlines Group Inc.*, No. 21-cv-11558-LTS (D. Mass.).

## IV.    FACTUAL BACKGROUND

### A.  Airline Industry Background

22.    Today, the commercial passenger airline industry is essential to commerce in the United States. Planes carry business travelers to meetings; lawyers to court appearances; college students to and from school; and vacationers to far away spots for rest, relaxation, and stimulation of the tourism industry.

23.    But despite the ubiquity and necessity of air travel, there are relatively few airlines with a meaningful presence in the United States, and only so much service those airlines can offer.

#### 1.  An airline's presence in the market, and its ability to compete, is limited by a number of constraints.

24.    There are a number of ways to measure an airline's presence in the market—the principal one being capacity. "Capacity" is, simply, the ability to offer space on a plane to purchasers. It is typically measured in ASMs, which are calculated by multiplying the number of seats on an aircraft by the distance traveled on the flight. Capacity varies not only by the number of flights flown, but also the size of the aircraft. Larger aircraft can carry more passengers per flight, increasing capacity even without increasing the number of flights. Conversely, if an airline company opts to fly a smaller plane in lieu of a larger one, it diminishes capacity. Reducing capacity raises prices.

25.    A second factor influencing an airline's presence in the market is the number of gates the airline controls—a plane must load passengers at a gate before take-off, and deplane passengers at another gate after landing—or else its capacity matters little.

7

26.     A third factor is the number of runway slots to which an airline has access. "Slots"—defined as "an authorization to either take-off or land at a particular airport on a particular day during a specified time period"—are issued by the Federal Aviation Administration (FAA). The FAA uses runway slots to limit scheduled air traffic at three capacity-constrained airports on the east coast: (1) JFK, (2) LaGuardia, and (3) Ronald Reagan Washington National Airport (Reagan).

27.     A fourth factor is air traffic demand. There is only so much space in the air above the airports through which planes seeking to take off or land can safely travel. At a number of airports in busy metropolitan areas, including, notably, Newark, the FAA monitors and manages air traffic demand. Having the capacity on a plane to Newark, and a gate to land at, can only enhance competition if the aircraft is allowed to fly into Newark airspace safely.

28.     Gates, slots, and airspace are fixed quantities: there are a finite number of gates at a given airport, only so many hours in a day that can be divided into take-off and landing slots, and only so much air space to accommodate air traffic. These resource constraints mean that there are high barriers to entry into the commercial airline market. To participate in the domestic airline industry, an airline must have not only the planes to transport customers, but also the slots, where required, gates at the appropriate airports, and authorization to travel through crowded airspace, where needed.

**2.   There are four categories of domestic airlines.**

29.     Modern domestic airlines can be grouped into four categories, according to their network scope, product differentiation, operational complexity, and associated cost structure.

30.     **Legacy Carriers.** American, Delta, and United are "legacy carriers"—entities that existed before the airline industry was deregulated in the late 1970s. Since deregulation, they have grown by consolidating the market, merging with other airlines, and reducing capacity to raise prices.

31.     The legacy carriers operate using a hub-and-spoke model: a large number of their flights arrive at one centralized location (the hub), and then passengers connect through those hubs to other locations (the spokes). This business model operates less efficiently than point-to-point models used by other airlines, and costs more to operate.

32.     Despite this more cumbersome and expensive business model, though, legacy airlines have historically dominated the U.S. airfare market.

33.     **Low-cost carriers.** The second category of airlines are low-cost carriers. Low-cost carriers utilize a point-to-point business model focused on moving passengers directly from one location to the next, without connecting through a central hub. Most low-cost carriers offer a single class of service (economy class) without upgraded options like business class or first class.

34.     Because their business model is leaner, they have lower costs than the legacy airlines—which means lower fares for purchasers.

35.     **Ultra-low-cost carriers.** The third category of airlines are ultra-low-cost carriers like Spirit Airlines (Spirit). These airlines focus their business models on routes that have high traffic and high demand for non-stop service.

36.     Ultra-low-cost carriers are able to charge ultra-low fares for their flights, in part because of their simplified business model, and in part because they charge extra for

amenities (like assigned seats or carry-on bags) that are often included in the fare price charged by other carriers.

37.     **Hybrid carriers.** Some carriers operate as a hybrid between legacy and low-cost carriers. These carriers may offer hub-and-spoke-style networks on a regional basis, or point-to-point travel with higher quality services, such as premium cabins.

38.     JetBlue operated as a hybrid carrier unique from all others, even other low-cost carriers. It offered both lower fares and higher quality travel. It was the only low-cost carrier to offer premium seating, free live television, and free Wi-Fi. Yet, because it offered point-to-point flying, it operated at a lower cost structure than the legacy airlines, and passed those savings on to purchasers.

### B. The domestic commercial airfare market is highly concentrated, with three legacy carriers dominating the field.

39.     Historically, the three legacy airlines—American, United, and Delta—have dominated the market for scheduled commercial air passenger service. Today, the legacy airlines, together with Southwest, collectively control over 80% of that service, measured in terms of capacity.

40.     These airlines control much of the limited slot and gate resources across the country. In 2019, the four airlines led the field in terms of number of gates. American had the most in the industry, with 798 gates; Delta had 687; United had 615; and Southwest had the fourth most with 300. In 2019 at the three airports requiring slots (JFK, LaGuardia, and Reagan), Delta had the most slots of any carrier, with 1,016 slots; American had 894 slots; JetBlue had 425 slots; and United had 221. Combined, American and JetBlue have more slots than any other airline at these airports.

41.     Differences between airline business models—legacy, low-cost, ultra-low-cost, and hybrid—reinforce this lopsided dynamic by limiting the ability of low-cost and ultra-low-cost carriers to compete in the market. Legacy carriers need only compete with each other and hybrid carriers, because other carriers do not provide travel options attractive to business travelers and other high-value travelers. Ultra-low-cost carriers and most low-cost carriers cannot compete for those passengers, since they offer only one class of service.

42.     These market dynamics contribute to high levels of concentration in the domestic commercial airline industry. For any given passenger, there are a limited number of options. For example, business travelers are constrained to choosing between legacy and hybrid carriers; and vacationers and others looking for inexpensive airfare often gravitate to the ultra-low-cost carriers.

43.     On average, only 4.5 airlines serve any given airport. To quantify the extent to which the market for scheduled commercial air passenger service is concentrated the Herfindahl-Hirschman Index (HHI), a traditional measure of market concentration often used in merger analyses, is instructive.

44.     Even before American and JetBlue entered into the Northeast Alliance, market concentration was astronomical: a 2014 governmental analysis revealed that, on average, the HHI for airline routes was between 4,202 and 5,375 in 2012. For reference, a market is considered highly concentrated if the HHI exceeds 2,500.

**1.   American, in particular, has championed consolidation to drive up its market share.**

45.     American has long been a proponent of increasing consolidation in the market (i.e., reducing choice and raising prices) as a model for driving revenue. And that

continues today: further consolidation of the already constrained air travel industry is one of American's long-term projects. Indeed, former American CEO Doug Parker was even referred to internally as the "Godfather of Consolidation."

46. On the other side, the DOJ has fought as the market regulator to ensure that the consolidations—including those by American—do not destroy competition.

47. Two consolidation efforts by American (or its predecessor, US Airways) prior to the Northeast Alliance have affected the affordability of travel across the country. In both cases, the DOJ required American to divest resources that were critical to preserving competition.

48. First, there was American's merger with US Airways in 2013, which brought together two of the oldest and most well-established airlines in the country. The DOJ and several states' attorneys general challenged the proposed merger, citing antitrust concerns, stating:

> Since 1978, the nation has relied on competition among airlines to promote affordability, innovation, and service and quality improvements. In recent years, however, the major airlines have, in tandem, raised fares, imposed new and higher fees, and reduced service. Competition has diminished and consumers have paid a heavy price. This merger—by creating the world's largest airline— would, in the words of US Airways' management, "finish[ ] industry evolution." It would reduce the number of major domestic airlines from five to four, and the number of "legacy" airlines—today, Delta, United, American, and US Airways—from four to three. In so doing, it threatens substantial harm to consumers. Because of the size of the airline industry, if this merger were approved, even a small increase in the price of airline tickets, checked bags, or flight change fees would cause hundreds of millions of dollars of harm to American consumers annually.

49. Before allowing the merger to proceed, the DOJ required American and US Airways to divest slots and gates to low-cost carriers, including JetBlue and Virgin America Inc., at a number of constrained airports—including 34 slots at LaGuardia and the

rights and interests to two airport gates at Boston Logan. The DOJ described these divestitures as necessary to enhance system-wide competition in the airline industry, provide more choices and more competitive airfares for consumers and promote competition between legacy and low-cost carriers. The DOJ even praised JetBlue's entry into the Boston-Reagan route as an example of how effective low-cost competition at a slot-controlled airport could "drive down fares and increase output."

50.     As a result of this slot divestiture, JetBlue acquired 40 Reagan slots, and several at LaGuardia. In total, the slots acquired by JetBlue in these divestiture proceedings amount to over 90% of its current Reagan slots and over half of its current LaGuardia slots.

51.     Second, there is American's long-standing codeshare alliance with Alaska Airlines, established in 1999. In 2016, when Alaska Airlines sought acquisition of Virgin America (Virgin), the DOJ challenged the American-Alaska codeshare agreement. It noted that, coupled with the proposed merger, Alaska's codeshare agreement with American would encourage Alaska to compete less aggressively (or not at all) on routes where Virgin and American competed.

52.     To alleviate the harm this would do to competition, the DOJ required the companies to significantly reduce the scope of their codeshare agreement, prohibited codesharing on routes where Virgin and American competed, and prohibited Alaska from transferring any interest in its assets to American. The DOJ intended this last requirement to ensure that American did not directly or indirectly regain control of the assets that American divested to Virgin to settle the agency's challenge to the American-US Airways merger.

53.     The newest iteration of the American-Alaska agreement, the "West Coast International Alliance," was announced in February 2020 and, in part, launched service from Seattle to both Bangalore, India and London Heathrow.

**2.  There are high barriers to entry in the domestic commercial airline industry.**

54.     Because there are a limited number of gates available, and a limited number of departure and arrival slots, it is difficult for newer airlines to break into the market and meaningfully affect competition. With the legacy airlines and Southwest hoarding hundreds, if not thousands, of gates and slots, other carriers cannot establish a firm presence in the market.

55.     Additionally, low-cost carriers compete for only a segment of air travelers—those that elect economy class—because (with the exception of JetBlue) none offer premium seating, and are thus unlikely to attract business and other would-be first class travelers.

**3.  Low-cost and hybrid carriers are essential forces in keeping scheduled commercial air travel affordable for purchasers and passengers.**

56.     Despite the high levels of concentration in the market, and the high barriers to entering competitors, low-cost carriers, and especially hybrid low-cost carriers, play an important role in constraining the pricing of legacy airlines, and, therefore, in keeping airfare affordable for purchasers. Because low-cost carriers maintain a lower cost structure, they can offer lower fares than legacy airlines.

57.     The low-cost and hybrid carrier's lower fares put downward pressure on legacy airlines' fares as well. Legacy airlines, including American, respond to competition from low-cost and hybrid carriers, in part, by dropping their prices to match the smaller airlines' fares. When a low-cost or hybrid carrier begins flying on a specific route, fares on

that route drop. On the other hand, when a low-cost or hybrid carrier stops flying a particular route, fares rise. In the past, when legacy airlines have attempted a coordinated price increase, their efforts have failed due to the presence of hybrid and low-cost carriers on the targeted routes.

58.     In 2019, JetBlue touted low-cost and hybrid airlines' critical role in keeping the commercial aviation industry competitive by acting as a check on the power of the legacy airlines. The legacy airlines, JetBlue has opined, routinely provide services at extremely high fares, and lower them only when faced with a low-cost competitor.

59.     The benefits of low-cost and hybrid carriers' presence on routes are not limited to only those purchasers who bought tickets for those airlines' flights: the airlines' very presence on those routes is enough to lower the fares for all carriers. That competition means cost savings to purchasers, but a threat to the legacy carriers' bottom line. As more low-cost carriers entered the market between 2000 and 2009, the legacy airlines collectively lost $70 billion, while low-cost carriers doubled their profits from $4 billion to $8 billion.

C. **Until 2020, JetBlue was a bulwark against the effects of consolidation on the domestic airfare market.**

60.     Among the low-cost and hybrid carriers, JetBlue historically stood out for its ability to offer quality service at lower fares and willingness to face down the legacy airlines.

61.     JetBlue followed the low-cost carrier model of stimulating demand by offering low-cost fares, but it also distinguished itself from other low-cost carriers by offering superior service, including complimentary in-flight Wi-Fi, seatback entertainment

at every seat, and more leg room. JetBlue was the only low-cost carrier to offer a premium-class product, called Mint, which was similar to a legacy airline's business class.

62.     JetBlue described itself as "a disruptor." And with good reason: it was more effective than other low-cost carriers at keeping the cost of commercial airfare down. A 2013 study performed by researchers at MIT found that, on average, when JetBlue began offering service on a route, it reduced fares along that route by approximately $32. In fact, JetBlue's presence in, or exit from, a particular route had the largest effect of any airline studied. JetBlue, historically, was so effective at reducing airfare prices that researchers gave it a name: the "JetBlue Effect."

63.     The JetBlue Effect describes the decrease in fares when JetBlue started flying a route, or the increase in fares when JetBlue stopped. JetBlue's entry or exit from a particular route can impact prices by anywhere from 14% up to 75%.

64.     JetBlue has touted this power to stockholders, governments, and regulators, claiming to bring be an important foil against the legacy carriers and touting its ability to lower fares, stimulate demand, and raise the bar in customer service.

65.     JetBlue conservatively estimated that, since its founding in 1998, it has saved purchasers more than $10 billion. In Boston alone, JetBlue estimated, it has saved purchasers $3 billion since 2004.

66.     In recent materials provided to investors about the JetBlue Effect, the company bragged that JetBlue triggers significantly greater fare decreases from legacy airlines when it enters a new market than when ultra-low-cost carriers enter a market. It estimated its effect on legacy fares on non-stop routes was approximately ~16% versus Spirit's 5%. In that same flyer, JetBlue gave examples: when it began flying from JFK to

San Antonio, Texas, fares dropped by about 27%, from $164 to $119; when it began flying from Boston to Milwaukee, Wisconsin, fares dropped about 48%, from $164 to $85; and when it began flying from Boston Logan to LaGuardia, fares dropped about 50%, from $165 to $82. Conversely, when JetBlue stopped flying from JFK to Richmond, fares rose by 65% and passenger counts fell by 49%.

67.     By offering Mint service, JetBlue was also successful in constraining the price of premium class tickets sold by legacy airlines. When JetBlue introduced Mint service along a route, business class fares decreased by as much as 79%. And by reducing the fees associated with flying on JetBlue (for example, by offering $0 change fees), JetBlue forced the legacy airlines to follow suit.

68.     The JetBlue Effect—the fare-constraining effect of JetBlue's business model—benefitted purchasers, whether they bought air passenger service from JetBlue or another carrier.

**D.  JetBlue and other low-cost carriers constituted an existential threat to legacy airlines' business models.**

69.     The legacy airlines did not respond to competition from low-cost carriers by shifting their business models to be more nimble, less-expensive operations, which low-cost carriers had proven to be a successful, lucrative, and competition-enhancing business model. Instead, they responded by entering into a series of mergers to gobble up more and more market power. Delta merged with Northwest Airlines in 1998. United merged with Continental Airlines in 2010. And American merged with US Airways in 2013.

70.     The DOT and the DOJ recognized that these mergers (and other agreements the legacies forged, such as slot swaps) had the potential to harm competition—especially

17

at resource-constrained airports like Boston Logan, JFK, LaGuardia, and Reagan. The government took steps to prevent those anticompetitive harms.

71.     As part of the American-US Airways merger, for example, the DOJ required the two companies to divest slots and gates at key constrained airports to low-cost carrier airlines to enhance system-wide competition resulting in more choices and more competitive airfares for purchasers. This included 34 slots at LaGuardia, 104 slots at Reagan, and 2 gates at Boston Logan.

72.     And when US Airways and Delta proposed a slot swap in 2011, the DOJ required the airlines to divest 32 slots at LaGuardia and 16 slots at Reagan.

### E.   JetBlue and American formed a "Northeast Alliance," which constrains competition and raises airfare prices across the country.

73.     In July 2020, American and JetBlue entered into a "Northeast Alliance." In it, they agreed to stop competing for customers on flights bound from or to four airports in the Northeast: JFK, LaGuardia, Newark, and Boston Logan. Instead, they agreed, they would collude to raise prices and restrict capacity, and then split the ill-gotten gains of their scheme.

74.     JetBlue was, until then, a loudly outspoken opponent of consolidation between the major airlines. It thought the legacy carriers were large, and that it was not in purchasers' interest to allow the giants to get even bigger and more powerful. Allowing legacy carriers to wield such power, JetBlue warned, left purchasers with reduced options, high fares, and poor service.

75.     But JetBlue's track record of disrupting markets, lowering prices, and advocating for competition came to an abrupt end in 2020. JetBlue knew, when it entered into the Northeast Alliance scheme, that it was departing radically from its decade long

18

strategy of growing as a disruptor, of bringing competition to the industry and cost savings to purchasers.

### 1. American conceived the idea for the Northeast Alliance in 2019.

76.     The idea originated within American in late 2019, and it was modelled on agreements American had previously made with foreign air carriers. Because American could not merge with a foreign air carrier, it had to create alliances that would mimic the effects of a merger. These alliances functioned as *de facto* mergers—intricate capacity coordination and revenue sharing.

77.     American pitched the idea of a domestic alliance to JetBlue and the two companies began negotiating what would become the Northeast Alliance during the first half of 2020. The goal of the negotiations, American and JetBlue have admitted, was to create a combined network in Boston and New York. They accomplished this through a set of inter-related agreements, which were finalized and executed by July 15, 2020.

78.     A team of JetBlue and American employees formed to accomplish this goal: in April and May 2020, they worked to reach consensus on an exemplar "optimized schedule." American's executives and board reviewed this optimized schedule and blessed entering into the Northeast Alliance. So did JetBlue's board of directors.

### 2. In July 2020, American and JetBlue entered into the Northeast Alliance.

79.     On July 15, 2020, American and JetBlue entered into the Northeast Alliance.

80.     Domestically, it was a unique agreement: no other arrangements between domestic airlines—short of an outright merger—attempted the extent of coordination, combination, and competition destruction that the Northeast Alliance achieved.

19

81.     The Northeast Alliance is memorialized in a set of related agreements: (1) the Northeast Alliance Agreement; (2) the Codeshare Agreement; (3) the Mutual Growth Incentive Agreement; (4) the Bilateral Special Prorate Agreement; (5) two Frequent Flyer Program Agreements; and (6) multiple Slot Lease Agreements. The two companies signed the bulk of these agreements on July 15 (the Bilateral Special Prorate Agreement and the slot lease agreements were signed later, in August and October 2020, respectively). The core aspects of the main agreements are described below.

### a.     The Northeast Alliance Agreement

82.     First, there is the Northeast Alliance Agreement—the governing agreement for the Alliance. The agreement covers all domestic routes covered by American and JetBlue, and long-haul flights by American, with the possibility of expanding to cover JetBlue long-haul flights as well.

83.     In it, American and JetBlue agreed to coordinate on all aspects of network planning at Boston Logan, JFK, LaGuardia, and Newark, including the flight route, flight schedule, flight airline, flight aircraft to be deployed, and whether American or JetBlue would run the flight. They also agreed to optimize their respective network plans and capacity, and communicate those plans to allow their partner to plan resources effectively. In the Northeast Alliance Agreement, "optimizing" capacity meant "coordinating" capacity. American and JetBlue also agreed to market and sell services, co-locate at airports, coordinate assets and facilities, and lease slots to one another.

84.     Under the Northeast Alliance Agreement, American and JetBlue formed a management committee charged with ensuring that the Northeast Alliance achieves all of the financial benefits that the defendants expected it would.

85.     The Northeast Alliance Agreement was later amended in September 2020 to prevent either company from selling or transferring slots at the four airports to any other airline, ensuring that capacity remained constrained.

###     b.     The Codeshare Agreement

86.     Second, there is the Codeshare Agreement. Codesharing is an arrangement in which one carrier (the "marketing carrier") places its airline code on a flight operated by another carrier (the "operating carrier"). The JetBlue-American Codesharing Agreement enabled American and JetBlue to sell each other's flights as their own.

87.     In the Codeshare Agreement, the two airlines agreed to "coordinate" their service schedules and pool their slots at JFK and LaGuardia. And they formed a joint management committee to identify ways to increase the benefits afforded to American and JetBlue—but notably not passengers or purchasers—under the agreement.

###     c.     The Loyalty Program Agreements

88.     Third, there are two reciprocal agreements governing the companies' frequent flyer programs called the "AAdvantage Participating Carrier Agreement" and the "TrueBlue Participating Carrier Agreement." These agreements allowed American's AAdvantage members to earn miles while flying on a JetBlue flight governed by the Northeast Alliance; and allowed JetBlue's TrueBlue customers to earn miles on an American flight within the Alliance.

89.     In conjunction with this agreement, American and JetBlue agreed to pay each other fees and charges associated with their own frequent flyer programs.

90.     By effectively erasing the distinction between the two airline's frequent flyer programs on the Northeast flights, American and JetBlue eliminated a potent source of competition between airlines for repeat customers.

### d.    The Mutual Growth Incentive Agreement

91.    Fourth, there is a Mutual Growth Incentive Agreement, in which American and JetBlue agreed to pool, and then share, the revenues earned on flights to and from the four airports. The agreement covers (a) all American domestic and international flights into or out of JFK, LaGuardia, Newark and Boston Logan, and (b) all JetBlue domestic and non-transatlantic international flights from those same airports (for example, flights from JFK to Cancún, Mexico or Vancouver, Canada, or from Boston Logan to Barbados).

92.    The Mutual Growth Incentive Agreement was designed for the most obvious effect: to align American and JetBlue's interests such that the two carriers would cooperate, not compete. This facet of the horizontal conspiracy had the explicit goal of making each carrier "metal neutral"—meaning "indifferent" as to whether a passenger chose an American flight or a JetBlue flight to, from, or through JFK, LaGuardia, Newark, or Boston Logan.

93.    For years before entering into the Northeast Alliance, American had evaded difficulties with mergers between domestic and foreign airlines by entering into joint ventures with foreign carriers. These joint ventures were designed as quasi-mergers—that is, they were designed to confer all the benefits (on the companies) of a merger. And a key piece of the joint ventures was revenue sharing.

94.    The Mutual Growth Incentive Agreement was modelled on the revenue-sharing provisions of American's international joint ventures with foreign carriers (ventures that JetBlue had criticized harshly, until it entered into this one). Put differently, American and JetBlue modelled their revenue sharing on provisions meant to confer the revenue-enhancing and competition-destroying perks of a merger, without actually entering into a merger. Revenue sharing ensured that both American and JetBlue were

22

incentivized to act cooperatively in the best interests of their partnership, rather than act competitively in their own self-interest. Revenue sharing of this ilk benefits would-be competitors, but is poisonous to competition.

95.     Under the Mutual Growth Incentive Agreement, JetBlue and American pooled their total revenues from Northeast Alliance routes, recovered from that pool their base revenues, and then split the excess between themselves. To apportion the shared revenue between the two companies, the Mutual Growth Incentive Agreement sets a "baseline" revenue. It defines that baseline as a company's 2019 revenue per equivalent seat mile (RESM—a standard industry revenue measure), multiplied by current capacity, and multiplied by a "stage length adjuster," which adjusts for flight length. That baseline revenue is subtracted from pooled total revenue to determine the excess, or "incremental," revenue. JetBlue and American then split that incremental revenue according to current capacity.

96.     A key aspect of the Mutual Growth Incentive Agreement is that it permits defendants to recapture some revenue it would have lost if the defendants were competing on Northeast Alliance routes. For example, absent the Northeast Alliance, if a purchaser chose JetBlue over American (because, for example, JetBlue's price was lower), American would lose that revenue entirely. But under the Mutual Growth Incentive Agreement, American is able to recapture some of that revenue that would have been lost. In that example, American is not fully penalized with a lost sale for having a higher price. .

97.     And it creates a penalty for not cooperating: if JetBlue's and American's incremental revenues were too different, one would owe a transfer payment to the other. This penalty payment could sour the entire Northeast Alliance. For example, after 2021,

JetBlue owed a larger transfer payment to American because American, the largest airline in the world, predictably had greater relative capacity compared to JetBlue—at least at the start of the Northeast Alliance. Rather than blow up the parties' new deal, though, American decided to forego almost 90% of that transfer payment, reflecting American's acknowledgement that it could make more money in the long run by cooperating, rather than competing. But this was a one-time adjustment: the parties did not amend the Mutual Growth Incentive Agreement to ensure lower transfer payments in the future.

98.    The Mutual Growth Incentive Agreement did not exist in a vacuum: it existed alongside the other agreements that formed the Northeast Alliance. And when read alongside those other agreements—which required coordination of capacity, routes, and schedules--the Mutual Growth Incentive Agreement removed incentives to compete.

### e.    Later-signed agreements

99.    Following the announcement of the Northeast Alliance in July 2020, American and JetBlue continued to form agreements to lock in their agreement not to compete.

100.    First, in August 2020, JetBlue and American executed the Bilateral Special Prorate Agreement for Passengers. Under that agreement, the defendants agreed to prorate each other's flights:

- For JetBlue flights sold by American that touch Boston Logan, JFK, LaGuardia, or Newark, the agreement allowed JetBlue to bill American a prorated ticket value, plus fees and surcharges.

- For American flights sold by JetBlue that touch Boston Logan, JFK, LaGuardia, or Newark, the agreement allowed American to bill Jet Blue a prorated ticket value, plus fees and surcharges.

- For JetBlue flights sold by American that do *not* touch Boston Logan, JFK, LaGuardia, or Newark, the agreement permitted JetBlue to bill American a fixed amount.

- For American flights sold by JetBlue that do *not* touch Boston Logan, JFK, LaGuardia, or Newark, the agreement permitted American to bill JetBlue a fixed amount.

101.    Second, in October 2020 the defendants executed a pair of slot lease agreements. American leased 10 slots at JFK and 37 slots at LaGuardia to JetBlue; and JetBlue, in turn, leased 8 JFK slots to American. This arrangement, though ultimately tied up in the Northeast Alliance, was contemplated in 2019, before the two airlines agreed to negotiate ways to coordinate, rather than compete. The exchange of 18 slots at JFK did not cancel the two leases out. Rather, it allowed the companies to ensure that they could schedule non-overlapping flights, ensuring that no American flight was flown at or near the time of a JetBlue flight on the same route, ensuring American offered no competition for JetBlue's sales, and vice versa.

   **3.  JetBlue and American announced the Northeast Alliance in July 2020, claiming it was beneficial for purchasers; but the DOT, DOJ, and competitors disagreed.**

102.    The two companies announced the scheme on July 16, 2020, and began implementing the Alliance in February 2021.

103.    When the defendants announced the "Northeast Alliance" in press releases, they claimed it was a good thing for purchasers:

> JetBlue Airways Corp. (NASDAQ: JBLU) and American Airlines Group Inc. (NASDAQ: AAL) today announced a strategic partnership that will create seamless connectivity for travelers in the Northeast and more choice for customers across their complementary domestic and international networks. In addition, the relationship will accelerate each airline's recovery as the travel industry adapts to new trends as a result of the pandemic.
>
> The partnership includes an alliance agreement that proposes codeshare and loyalty benefits that will enhance each carrier's offerings in New York and Boston, providing strategic growth and driving value for customers and crewmembers of both airlines.

104.    But in later press releases when the Alliance was implemented, both American and JetBlue bragged that the Alliance allowed them to expand at the expense of their competitors. According to a February 18, 2021 press release by American:

> Beginning in April, *American and JetBlue will offer more flights than any other carrier* when they coordinate convenient schedules on the popular New York (JFK and EWR) to Los Angeles (LAX) route . . . .

105.    JetBlue announced:

> The Northeast alliance will also enable new service from New York's LaGuardia Airport (LGA) . . . . With these additions, *American and JetBlue will offer more service between New York and Florida than any other carrier.*

106.    Each company exalted their gains from the Northeast Alliance, acknowledging that their rapid market share gains would not be possible without the Alliance; they predicted that the Alliance would make the two companies, together, the fastest-growing airlines in the Northeast and enable rapid expansion. Because gates, slots, and air traffic are in such short supply at and around Boston Logan, JFK, LaGuardia, and Newark, these gains by American and JetBlue meant diminished presence by other competing airlines. In other words, American and Jet Blue were not adding to overall

capacity at the Northeast Alliance airports. They were not touting the creation of new capacity. And they were not cheering enhanced competition. They were bragging about taking market share away from competitors, splitting that newly acquired share between them, and charging purchasers increased prices as a result.

107.    With this newly-acquired market power, American and JetBlue restricted capacity, which raised prices, at the Northeast Alliance airports.

> **a.    The U.S. Department of Transportation recognized the anticompetitive effects of the Northeast Alliance.**

108.    From the outset, American and JetBlue knew their alliance would invite regulatory scrutiny. Given American's and JetBlue's prominent place in the domestic commercial airline industry, an outright merger would have invited a challenge under Section 7 of the Clayton Act. That is why they opted instead for a quasi-merger in the style of American's joint ventures with foreign airlines.

109.    But even so, the unprecedented nature of the Northeast Alliance brought intense regulatory scrutiny: JetBlue outlined the antitrust risks of the Northeast Alliance Agreement in a presentation to its Board of directors. It classified the antitrust risk as "high" due to the extent of integration and the geographic scope of the Northeast Alliance's effects. The risks JetBlue identified included the fact that the codesharing agreement could lead to capacity reductions on overlapping routes; the fact that the agreement combined codesharing elements and a revenue sharing agreement; and the interplay between the revenue sharing agreement, schedule coordination obligations, and marketing coordination between the companies. All of these elements, JetBlue warned, could reduce competition. And sure enough, DOJ conducted a review pursuant to its civil investigative authority

under 15 U.S.C. § 1312; the DOT reviewed the Alliance under 49 U.S.C. § 41720; and Spirit filed a formal administrative complaint with the DOT.

<b>b.    American and JetBlue did not fully address the DOT's concerns—let alone the anticompetitive effects of the Alliance.</b>

110.    On July 22, 2020, American and JetBlue submitted the Northeast Alliance Agreements to the DOT, pursuant to 49 U.S.C. § 41720, which requires major air carriers to submit joint venture agreements to the agency, and allows at least 30 days for review. Section 41720 does not permit the DOT to make dispositive decisions permitting or prohibiting a joint venture—it allows only for the DOT to raise concerns.

111.    And the DOT did raise concerns, leading to an agreement between the DOT and the defendants. JetBlue and American made a handful of commitments to the agency, such as agreeing to exclude certain routes from the Northeast Alliance. But those commitments did not address all of the DOT's concerns; they addressed only some of the anticompetitive harm the DOT identified.

112.    The DOT required American and JetBlue to exempt certain routes from their codesharing agreement. And it required American and JetBlue to divest 7 slot pairs (i.e., 14 slots, total) at JFK and to temporarily divest 6 slot pairs (i.e., 12 slots) at Reagan. But in context, 14 slots at JFK represents only roughly 1.8% of the total slots that American and JetBlue hold in New York City. And at Reagan, 12 slots comprise less than 2.5% of their total slots.

113.    The DOT-JetBlue-American agreement does not require American and JetBlue to divest any slots at LaGuardia. And it does not provide any remedy—even a partial remedy—for the ill effects of the Northeast Alliance at Boston Logan.

28

114.    Although the Northeast Alliance was executed in July 2020 and first implemented in early 2021, the modest slot transfers were not scheduled to begin until mid-January 2022.

115.    And the slot divestitures at Reagan are temporary, to expire (unless renewed) in 2025. The temporary nature of this concession dramatically diminishes its remedial value. Other carriers are unlikely to invest the time, effort, and resources needed to fly a new route or a new schedule into Reagan, only to abandon its efforts a few years later.

116.    In January 2021, the DOT terminated its review of the agreement and allowed the Alliance to go into effect before it could exact more meaningful concessions. But as the DOT later explained, it terminated review not because it was satisfied the Alliance would not harm competition; it ended its review in deference to the DOJ's parallel investigation.

> **c.    The DOJ investigated the Northeast Alliance and, in 2021, filed suit against American and JetBlue for violating the antitrust laws.**

117.    At the same time that the DOT was reviewing American's and JetBlue's submissions about the Northeast Alliance, the DOJ was also investigating whether the Northeast Alliance violated antitrust laws.

118.    On September 21, 2021, the DOJ, along with the attorneys general of Arizona, California, the District of Columbia, Florida, Massachusetts, Pennsylvania, and Virginia, sued American and JetBlue in this District under Section 1 of the Sherman Act, 15 U.S.C. § 1 "to prevent harm to consumers that will occur once the [Northeast Alliance] is fully implemented[.]"*United States v. American Airlines Group Inc.*, No. 21-cv-11558-LTS (D. Mass.).

29

119.   The DOJ alleges that:

> By consolidating [JetBlue's and American's] businesses in this way, American and JetBlue will effectively merge their operations on flights to and from the four airports . . . In so doing, the Northeast Alliance will eliminate significant competition between American and JetBlue that has led to lower fares and higher quality service for consumers traveling to and from those airports. It will also tie JetBlue's fate to that of American, diminishing JetBlue's incentives to compete with American in markets across the country. The United States and Plaintiff States bring this action to prevent the hundreds of millions in harm to consumers that will occur if these two rivals are permitted to maintain this [Alliance.]

120.   In other words, the DOJ and the states that joined its suit seek only prospective injunctive relief against the future operation of the Northeast Alliance. Neither the DOJ nor the states seek monetary damages on behalf of purchasers that have already accrued, and continue to accrue.

121.   JetBlue and American moved to dismiss the claim at the outset of the suit, arguing that the complaint did not allege adverse effects on competition, and that the complaint failed to allege market power. In a two-paragraph order, the district court denied the airlines' motion, finding that the complaint, which alleged the same conduct alleged herein, "alleges—plausibly and in a manner that is neither conclusory nor threadbare—that the alliance at issue between American and JetBlue is likely to harm competition in the relevant markets, and that American and JetBlue control a significant share in an already concentrated market."

122.   After discovery, JetBlue and American did not move for summary judgment; the case proceeded to a bench trial held September 27–October 27, 2022. A decision in that case remains pending.

d.    **Other low-cost and ultra-low-cost carriers recognize that the Northeast Alliance harms competition.**

123.    The DOT and the DOJ were not the only ones to recognize the anticompetitive effects of American and JetBlue's Northeast Alliance. On January 7, 2021, before the Northeast Alliance even took effect, Spirit filed a complaint before the DOT.

124.    Spirit spelled out the anticompetitive harms from American and JetBlue's Northeast Alliance from the perspective of expert participants in the industry, based on well-recognized sources of information and metrics for assessing the effects of joint ventures in the airline industry.

125.    In light of the Northeast Alliance, Spirit opined, it was unrealistic to think that American and JetBlue would compete against each other in geographic markets and routes at the four northeast airports, resulting in the loss of a competitor and an increase in the already high concentration levels in New York and Boston.

126.    Spirit also looked at direct measures of loss of competition, concluding 18 routes would lose significant competition—including five Boston routes that would end up with one competitor with 78% seat share; and nine markets at JFK and three at LaGuardia that would go from having three competitors to only two.

127.    Following Spirit's complaint, Southwest submitted a letter to the *Spirit* docket expressing concerns that the Northeast Alliance raises antitrust concerns that, if left unchecked, would lead to further anticompetitive harm by American and JetBlue at other airports.

128.    Both Southwest and Spirit pointed out that a large proportion of the slots that American and JetBlue agreed to share at JFK and for flights to and from Reagan were slots that the DOT and the DOJ had previously forced American (and its predecessor) to

divest in prior mergers and alliances. The Northeast Agreement, they both pointed out, would completely nullify the DOT and the DOJ's prior attempts to prevent American from amassing too much market power at some of the country's most constrained airports.

129.    On May 21, 2021, Spirit supplemented its original complaint with information gleaned once the Northeast Alliance went into effect. In the supplemental filing, Spirit painstakingly documented the way in which the Northeast Alliance was giving American, in particular, an anticompetitive advantage in the market.

130.    Spirit observed that American and JetBlue's codeshares overlap almost completely with airports covered by American-Alaska codeshares—referring the American-Alaska joint venture. The fact that American sells 578 routes that combine legs flown by each of the three airlines (American, Alaska, and JetBlue) enables American to undermine the pro-competitive policy of antitrust review in the airline industry. American now holds the power to dominate hundreds, if not thousands, of routes—making the harm from the Northeast Alliance even worse than initially feared.

131.    Spirit also documented evidence of price-fixing: where JetBlue and American were the only airlines serving a route, they appeared to charge identical—and higher—fares. On routes where they faced competition, JetBlue lowered its price to compete with other carriers, and American raised its fares significantly higher. This made JetBlue's offering look like a great deal, even though a purchaser who bought a JetBlue ticket and one who bought an American ticket was buying a ticket to fly on the same route, on the same plane, in the same class, with the same crew, and the same frequent flyer benefits." This ability to arbitrarily raise fares, Spirit observed, should cause concern.

132.   In its supplemental filing, Spirit told the DOT that the Northeast Alliance gives American the power to raise prices, limit competition from Alaska and JetBlue, and block new entry at New York, Boston, and Washington Reagan Airports. Spirit documented the extensive overlap between routes covered by the American-Alaska partnership and the Northeast Alliance—including some routes on which American and Alaska were expressly forbidden by a 2017 court order from coordinating. And it presented evidence that the Northeast Alliance is causing loss of competition across the country.

133.   Spirit's supplemental filing also addressed American and JetBlue's stranglehold on large numbers of slots and gates at the Northeast Alliance airports. The large share of gates and slots between the two companies, Spirit explained, prevented all other airlines from providing new service—either as an expansion of prior service or as a new competitor—to combat the Alliance.

134.   When the DOT suspended its review of the Northeast Alliance in deference to the DOJ's pending lawsuit, it also stayed its consideration of Spirit's administrative complaint.

135.   Following Spirit's complaint to the DOT, in July 2022, JetBlue announced an attempted hostile takeover of Spirit. That effort, if successful, would not only moot Spirit's complaint, dampening the scrutiny the Northeast Alliance receives, but also remove yet another competitor from the already consolidated market.

**F.  The Northeast Alliance restricts the available flights into and out of the Northeast, and raises airfare prices across the region.**

136.   Monopoly power is defined as the ability to restrict output and increase price in a relevant market. The Northeast Alliance gave JetBlue and American the power to do just that.

33

1. **Prior to the Northeast Alliance, JetBlue and American fiercely competed head-to-head in the Northeast.**

   a. **Prior to the Northeast Alliance, JetBlue and American previously competed head-to-head in Boston.**

137.    In Boston, JetBlue was the dominant airline—offering more flights to more destinations than any other airline in the history of Boston Logan. There, JetBlue held a 33% market share based on domestic traffic. Boston is JetBlue's second largest focus city in terms of operations, behind only New York City.

138.    American is also a strong presence in Boston with considerable market power. After merging with US Airways in 2013, American had the second most peak-day departures among airlines serving Boston Logan. American remained the second largest airline at Boston Logan from 2013 to 2018, before Delta tied American in 2019.

139.    Before the Northeast Alliance, JetBlue forced American to compete on price for routes into, through, and out of Boston Logan—resulting in lower fares for purchasers. JetBlue estimated that it has saved customers traveling to and from the city of Boston alone $3 billion since it arrived at Boston Logan in 2004.

140.    A number of examples demonstrate the head-to-head competition between JetBlue and American in Boston, prior to the Northeast Alliance:

   a. When JetBlue in 2018 launched a regional sale on travel from Boston and New York City to a number of destinations in the Southeastern United States, American responded by first matching JetBlue's sale, and then extending the length of the sale and expanding the days of the week of the sale. JetBlue was then the only airline to match American's expanded fare sale for seven routes—including for flights between Boston and Charlotte.

b.   When JetBlue lowered its fare on the route between Boston Logan and LaGuardia, American also lowered its fare on that route.

c.   After JetBlue entered the non-stop route between Boston Logan and Reagan, American dropped its prices by 60%.

141.   Prior to the Northeast Alliance, American was one of JetBlue's "primary competitors" for corporate customers in Boston. JetBlue is more dependent on business travelers in Boston than anywhere else in its network: Boston represents JetBlue's "largest corporate partner base." Competition between American and JetBlue prior to the Northeast Alliance was aggressive. To win over corporate customers who had traditionally relied on American's routes between Boston and LaGuardia, Reagan, and Philadelphia, JetBlue in December 2019 added "shuttle flights" to those routes. American responded by offering steeper shuttle discounts for corporate customers traveling from Boston to LaGuardia to try to thwart JetBlue's success on those routes. This led to a decrease in American's published fares. (Under the Northeast Alliance, American no longer flies the Boston Logan-LaGuardia route.)

142.   American feared (prior to the Northeast Alliance) that it would be "pushed out" of Boston. Despite its large presence, American's operations at Boston Logan were not as profitable as its operations elsewhere, principally due to JetBlue's aggressive competition. To try to remedy this, American artificially restricted its capacity in Boston: it underutilized its gates, thus choking off capacity and raising prices for purchasers.

**a. Purchasers benefitted from the JetBlue Effect in Boston.**

143.    The JetBlue Effect at Boston Logan led to decreased fares and increased traffic. In total, JetBlue estimated that, as of January 2019, competition from JetBlue had saved Boston travelers more than $3 billion.

144.    A number of examples demonstrate the JetBlue Effect in Boston:

a.    Fares along the Boston Logan-Reagan route dropped 65% and traffic nearly doubled after JetBlue entered the market;

b.    The average walk-up fare for trips between Boston Logan and Reagan fell from $484 to $188;

c.    When JetBlue started flying from Boston Logan to Buffalo, New York, the fares for that route decreased by 50% and the traffic volume increased by 200%;

d.    After JetBlue began flying the route between Boston Logan and Newark, fares dropped 54% and traffic increased 158%;

e.    When JetBlue began flying between Boston Logan and LaGuardia in October 2016, the price of walk-up tickets dropped approximately 70% overnight—from $434 to $129; and overall fares on that route decreased by 51% compared to the year before JetBlue offered the Boston Logan-LaGuardia route.

145.    These concrete results of the JetBlue Effect demonstrate the meaningful benefits to purchasers and passengers that resulted from healthy competition between JetBlue and American in Boston.

       **b.**    **American and JetBlue previously competed head-to-head in New York City.**

146.    American has historically been a market leader in New York City. Between 2008 and 2012, American had the third highest market share in the New York City metropolitan area; after merging with US Airways in 2013, American sought to become the "#1" airline in the eastern United States, with a "good presence in New York City." By 2019, American was the second largest airline carrier in New York City—with a 22% market share of domestic air traffic.

147.    Still, despite its role as the largest airline carrier in the world, American has underutilized its slots in New York City for years, operating smaller aircraft and obtaining FAA waivers to avoid complying with regulations aimed at enhancing capacity and competition. While underutilization may seem a counterintuitive approach to competition, American's admitted goal in underutilizing its gates and slots was to suppress competition.

148.    New York City is an essential location for both American and JetBlue. Without a strong presence in New York City, American's ability to compete as a hub-and-spoke airline would be diminished. And JetBlue considered itself "New York's Hometown Airline." Today, JetBlue is the second largest slot holder at JFK with 250 peak slots—roughly one quarter of all peak slots at the airport.

149.    Just as they did in Boston, American and JetBlue competed on price for New York City routes before the Northeast Alliance. Consider the following examples:

- American and JetBlue regularly matched each other's nonstop fares on certain LaGuardia and JFK routes;

- After JetBlue launched its Mint service in 2014, American lowered its business class fares significantly on important transcontinental routes,

dropping its refundable business fare on its JFK-Los-Angeles route from $4,009 to $2,313 and on its JFK-San Francisco route from $1,926 to $506;

- When JetBlue launched a regional sale in November 2018 that included JFK, American responded by matching, and then expanding on, JetBlue's sale; then JetBlue in turn matched American's expanded fare sale for seven routes on which JetBlue and American service overlapped;

- JetBlue also lowered prices between JFK and Seattle, Washington in early 2019, which caused American to experience "yield softness"—a measure of ticket price—for coach fares along that route; and

- In January 2019, when American attempted a $5 network-wide price increase, Delta, United, and Southwest matched its increase, but JetBlue did not, forcing American and the other airlines to abandon the attempted price hike.

**b.  Purchasers benefitted from the JetBlue Effect in New York.**

150.   The JetBlue Effect led to more passengers, decreased fares, and better service in New York City. JetBlue's entry into the New York City market in 1999 led passenger volume at JFK to approximately double in size from 31.7 million to 62 million passengers in 2018.

151.   In New York City, JetBlue introduced a superior product—Mint—to compete with legacy carriers' premium class travel at a lower price, causing legacy carriers' premium fares to drop. Even in economy class, JetBlue's pricing undercut legacy nonstop competitors with connecting fares.

152.    The magnitude of the JetBlue Effect could also be measured by what happened when JetBlue stopped flying a route: fares increased. When JetBlue stopped flying between JFK and Richmond, Virginia, industry-wide fares rose by 65% and passenger count fell by 49% within a year. When JetBlue stopped flying between JFK and Pittsburgh, Pennsylvania, fares rose by 75% and passenger count fell by 68%.

153.    These concrete market reactions resulting from the JetBlue Effect demonstrate the meaningful benefits to purchasers that resulted from healthy competition between JetBlue and the legacy airlines in New York City.

### 2.   The Northeast Alliance restricts available flights.

#### a.   The Northeast Alliance makes American and JetBlue metal neutral within the scope of their agreement.

154.    The Northeast Alliance's revenue sharing mechanism within the Northeast Alliance renders American and JetBlue "metal neutral." This means that they are both indifferent as to whether a customer flies on an American or JetBlue plane.

155.    This apathy derives principally from the Mutual Growth Incentive Agreement, which contains the defendants' agreement to split the revenue earned as a result of their Alliance. It does not matter whether customers are choosing JetBlue or American flights. Both companies would earn revenue on a ticket to, from, or through Boston Logan, JFK, LaGuardia, or Newark, regardless of whether a ticketholder flew on a plane it owned, or one owned by American.

156.    As much as American and JetBlue may now try to deny it (despite repeated prior pronouncements, including some under oath), metal neutrality is a feature of the Northeast Alliance, not a bug. This metal neutrality eliminates any economic incentive for American and JetBlue to compete and subsequently win business from one another.

       **b.**    **American and JetBlue now cooperate instead of compete on Northeast Alliance Routes.**

157.    The Northeast Alliance ended the fierce head-to-head competition between American and JetBlue in Boston and New York City. Instead, American and JetBlue now actively coordinate on the Northeast Alliance routes.

158.    The two former competitors are now collaborators, at least in the northeast. There is one less competitor in the market.

159.    This coordination demonstrates that American and JetBlue do not view each other as competitors to vie against, relative to both network and sales competition.

       **c.**    **Because of this coordination, fewer flights are available on the Northeast Alliance routes.**

160.    Because American and JetBlue no longer view each other as competitors within the Northeast Alliance, fewer flights will now be available in Boston and New York City.

161.    Under the capacity coordination provisions of the Northeast Alliance, American and JetBlue share their respective key flight patterns and connectivity to optimize schedules with each other. This capacity coordination, therefore, incentivizes them to eliminate overlapping flights on NEA routes.

162.    And they have. Since entering into the Northeast Alliance, American has stopped flying between LaGuardia and Boston—a route on which it once competed vigorously with JetBlue. It has stopped flying the route between JFK and San Diego. And it plans to exit the route between JFK and San Francisco. JetBlue has decreased capacity at Boston Logan and Newark. All of these changes reflect a joint decision by American and JetBlue, as required in the Northeast Alliance Agreement. As JetBlue's CEO has

stated, under oath, American and JetBlue agreed to allocate markets within the Northeast Alliance.

163.    Within the Northeast Alliance routes, there was, prior to the Alliance, a significant amount of overlap between JetBlue's service and American's. Of the nonstop routes served by American from the Northeast Alliance airports, 30% are also served by JetBlue. Of the nonstop routes served by JetBlue from the Northeast Alliance airports, 27% are also served by American. This significant overlap only heightens the concern for how a reduction in flights will harm customers in Boston and New York City airports.

164.    American and JetBlue's aligned incentives and ability to coordinate capacity under the Northeast Alliance make it more likely, as a matter of economic principle, that they will jointly cut capacity in overlap markets, thereby raising prices.

### 3.  The Northeast Alliance allows JetBlue and American to maintain and/or raise airfare prices across the region

165.    The Northeast Alliance allowed JetBlue and American to maintain and/or raise prices for purchasers. Even though, in 2021, American and JetBlue agreed to cut JetBlue's capacity by 10%, JetBlue's revenue reached record heights.

166.    The revenue-sharing component of the Northeast Alliance causes upward pressure on the defendants' prices. For example, prior to the Northeast Alliance, if a customer chose JetBlue instead of American for a flight covered by the Northeast Alliance, American would lose that revenue. To compete with JetBlue in that scenario, American would be incentivized to reduce its prices to win the customer's business. In that same scenario under the Northeast Alliance, however, American does not completely lose the revenue when the customer choses JetBlue because American is able to capture some amount of that revenue through the Northeast Alliance's revenue-sharing provisions. The

defendants thus have less incentive to compete on price because they still stand to receive revenue even when purchasers choose one defendant over the other.

167.    An industry expert in the DOJ action estimated that the reduced competition and increased prices caused by the Northeast Alliance will result in purchasers overpaying to the tune of $696 million annually. This estimate represents the additional amount of money—the overcharge—that customers would have to pay in a given year to purchase the same tickets that they would have absent the Northeast Alliance. The industry expert estimated that prices will rise not only for JetBlue and American customers, but also for customers of other airlines that compete for JetBlue and American customers in routes affected by the Northeast Alliance. On average, the expert estimated that the defendants' prices will increase 16 percent due to the Northeast Alliance, while all other airline's prices will increase 9 percent.

168.    The DOJ expert estimated that $428 million of the $696 million annual overcharge is attributable to routes to and from Boston Logan. By way of example, the expert calculated that purchasers on the Boston Logan to Reagan routes would experience annual overcharges amounting to $108 million, representing a 55 percent price increase.

169.    The DOJ expert's estimated price impact is consistent with other economic analysis. The expert conducted a regression analysis, which looked at the effect of removing legacy airlines, like American, from routes. The expert concluded that removing competition from legacy airlines resulted in average price increases of 15 percent. This is consistent with the average price increases the expert estimated as resulting from the Northeast Alliance.

170.    That the Northeast Alliance acts to maintain and/or raise prices for class members is consistent with a real-world example where American reduced capacity on routes and JetBlue increased prices. The DOJ's expert looked at how prices behaved when American was forced to ground its Boeing 737 MAX fleet due to an FAA mandate following certain crashes involving the 737 MAX. The grounding of these aircraft resulted in reduced capacity for American in routes touching New York City airports. Through additional econometric analysis, the expert determined that JetBlue increased its prices, on average, by 7.8 percent on these routes. As JetBlue's Pricing Manager, Evan Jarashow, testified, the higher prices were "an adjustment, really, to a demand scenario that resulted from the 737 MAX groundings." The results of this analysis showing a 7.8 percent price increase is consistent with the DOJ expert's estimation of price impact for the New York City routes due to the Northeast Alliance, which found an 8.5 percent price increase for the defendants' flights and 4.6 percent price increase for flights from other airlines.

171.    Further econometric analysis presented in the DOJ action, using an alternative econometric model focused on supply, showed that the annual overcharge to purchasers could be as high as $989 million on nonstop routes included in the Northeast Alliance.

### 4.  The Northeast Alliance combines JetBlue's and American's market share

172.    Under the Northeast Alliance, American and JetBlue have combined their considerable individual market power on routes to, from, or through Boston Logan, JFK, LaGuardia, and Newark.

173.    Where JetBlue already had the largest market share at Boston Logan, it only grew with the combination following the Alliance. Now, the defendants have no less than a 49.8% share of the market on each non-stop route they fly that touches Boston Logan:

      a.   Boston-Charlotte: 96.1% (combined revenue share);

      b.   Boston-Chicago: 48.5%;

      c.   Boston-Dallas: 83.6%;

      d.   Boston-Los Angeles: 62.6%;

      e.   Boston-Miami: 76.5%;

      f.   Boston-New York City: (JFK or LaGuardia): 49.8%;

      g.   Boston-Philadelphia: 86.8%;

      h.   Boston-Phoenix: 85.2%;

      i.   Boston-Rochester: 86.2%;

      j.   Boston-m: 82.1%; and

      k.   Boston-Washington D.C. (Reagan National): 88%.

174.    All but one of these routes was already considered extremely concentrated prior to the Northeast Alliance, with HHIs ranging from 2,721 to 5,727 points.

175.    When American and JetBlue entered into the Northeast Alliance, they increased the HHI for each of the Boston-related routes by at least 940 points, and as much as a whopping 3,870 points. The resulting HHI on each of these Boston-related routes far exceeds 2,500 (ranging from 3,661 to 9,245). Because American and JetBlue's conduct raised the HHI on each of these routes by more than 200 points, to a total in excess of 2,500 points, the Northeast Alliance must be presumed to enhance market power and harm

competition at Boston Logan airport, according to the guidelines established by the DOJ and FTC.

176.    The only Boston-related route that was not already highly concentrated before American and JetBlue entered into the Northeast Alliance, between Boston Logan and Los Angeles, was already moderately concentrated—barely missing the 2,500 point benchmark for being considered highly concentrated—at 2,463. But that does not mean American and JetBlue did not have an anticompetitive effect on that route. The Northeast Alliance raised that baseline by 1,941 points, for a resulting HHI of 4,404 points. Because the defendants' conduct raised the HHI by more than 200 points, to a level exceeding 2,500, their conduct is deemed, under the DOJ and FTC's guidelines, to be "highly likely to raise significant competitive concerns."

177.    Additionally, the defendants have a combined revenue share of over 31% for each of the 18 routes between JFK/LaGuardia or Newark Liberty and major airports, as listed below:

 a.  New York (JFK/LaGuardia)-Austin: 44.6%;

 b.  New York-Charleston: 43.6%;

 c.  New York-Chicago: 36.2%;

 d.  New York-Las Vegas: 46.5%;

 e.  New York-Los Angeles: 57%;

 f.  New York-Martha's Vineyard: 92.5%;

 g.  New York-Miami: 55.9%;

 h.  Newark Liberty-Miami: 31%;

 i.  New York-Nantucket: 96.8%;

      j.   New York-Orlando: 55.3%;

      k.  New York-Phoenix: 61.5%;

      l.   New York-Portland: 37.4%;

      m.  New York-Raleigh-Durham: 47.8%;

      n.  New York-San Diego: 44.7%;

      o.  New York-San Francisco: 45.7%;

      p.  New York-Savannah: 46.5%; and

      q.  New York-West Palm Beach: 60%.

178.    Prior to the Northeast Alliance, competition on each of these routes was already highly consolidated, with HHI values between 2,525 and 8,057. By entering into the Northeast Alliance, American and JetBlue raised the HHI on each of these routes by between 207 and 2,584 points, resulting in even higher post-Alliance HHIs between 2,732 and 9,091. Because American and JetBlue's conduct raised the HHI on each of these routes by more than 200 points, to a total in excess of 2,500 points, the Northeast Alliance is presumed to enhance market power and harm competition in the New York City airports.

179.    In 2019, prior to the Northeast Alliance, the general, non-route-specific market share of each of the two airlines in the Boston and New York City metro areas was as follows:

      a.  New York City:

          (i)     American: 16%

          (ii)    JetBlue: 24%

      b.  Boston:

          (i)     American: 16%

        (ii)     JetBlue: 35%

180. Therefore, the combined market share in 2019 of the two previously independent entities is as follows:

    a. New York City—JetBlue and American: 40%

    b. Boston—JetBlue and American: 51%

181. The anticompetitive harm from American and JetBlue's collusion was not limited just to routes that they jointly flew into, out of, or through Boston Logan, JFK, LaGuardia, and Newark. When the DOJ sued American and JetBlue, it calculated the effect of the Northeast Alliance on 98 routes that depended on connecting service at one of the four Alliance airports. On each of those routes, JetBlue and American's Alliance raised the HHI by more than 200 points, to totals exceeding (and often far exceeding) 2,500 points. Accordingly, JetBlue and American must be presumed to have enhanced their market power and harmed competition on all of those routes, as well.

### 5. The Northeast Alliance gives American control once more over assets the DOJ forced it to divest in order to preserve competition.

182. Previously, the DOJ had required American (and US Airways, which merged with American in 2013) to divest a number of resources to low-cost carriers in order to ensure that US Airway's slot swap with Delta in 2011 and American's merger with US Airways in 2013 did not foist anticompetitive consequences on purchasers.

183. JetBlue acquired a number of slots at Reagan and LaGuardia as a result of these divestitures and used them to create rigorous head-to-head competition with American's Boston-Washington, D.C. route.

184.    But after American entered into the Northeast Alliance, those slots are once more under American's effective control. In the Northeast Alliance, American and JetBlue agreed to coordinate—meaning that JetBlue needed American's sign off on how to use those slots. That is precisely the kind of market power that the DOJ sought to keep American from exercising over those slots when it forced American (and its predecessor) to divest.

185.    And when American had formed its joint venture with Alaska, it was prohibited from offering service along certain routes, including one between JFK and Seattle and another between Newark and Seattle.

186.    After American entered into the Northeast Alliance, however, its codesharing agreements with JetBlue and Alaska, when combined, mean that American is able to market routes between JFK and Newark, on one end, and Seattle on the other by putting its code on legs of that trip separately operated by JetBlue and Alaska. In other words, by entering into the Northeast Alliance with JetBlue, American is able (with JetBlue's help) to evade a federal court order.

187.    The Northeast Alliance undermines the DOJ's and a federal court's efforts at creating competition. As a result of the Northeast Alliance (together with American's deal with Alaska) two-thirds of the slots that American's predecessor US Airways was forced to divest in the Delta-US Airways slot swap deal and almost 50% of the Reagan slots American had to divest in its merger with US Airways are once again under American's direct influence. And American is able to offer itineraries along routes that a court forbid it from flying.

48

## V.     MARKET POWER AND MARKET DEFINITION

188.    Insofar as the plaintiff may be required to plead the relevant product and geographic market, as opposed to relying on direct evidence of market power, she alleges as follows.

189.    The relevant antitrust market is the market for scheduled commercial air passenger service in the United States.

190.    American and JetBlue acquired and used market power, jointly obtained and used monopoly power, and/or attempted jointly or individually to acquire and use, monopoly power in the relevant market by constraining capacity and raising prices for flights to, from, or through Boston Logan International Airport, John F. Kennedy International Airport, LaGuardia Airport, and Newark-Liberty International Airport.

191.    Millions of passengers yearly fan out across the country from the Northeast airports; millions converge on those airports; and even more pass through them on the way to their final destination. By restricting capacity (i.e., diminishing output) and raising prices on flights to, from, or through Boston Logan, JetBlue and American sent the anticompetitive effects of their Northeast Alliance scheme zooming around the country.

192.    Accordingly, the relevant geographic market, to the extent one must be alleged, is the entire United States.

193.    Each of these airports is resource-constrained—whether by gate availability, slot availability, or restrictions on air traffic. Each airport can accommodate only so much traffic, and, therefore, can support only so much capacity. There are only so many hours in the day that can be divided into take-off and landing slots at JFK and LaGuardia; only so much physical space for air traffic to safely navigate over Newark; and only so many gates to use for boarding and deplaning passengers at all airports.

194.    An airline, or an alliance of airlines, can acquire and hold market power at Boston Logan, JFK, LaGuardia, or Newark by controlling a significant number of gates, or holding a significant number of take-off or landing slots.

195.    As one airline or alliance of airlines acquires more of one of these finite, limited resources, its gain must come at a competitor's loss, because new slots, gates, and physical space for air traffic cannot be created. Accordingly, even modest gains in one or more of these resources can represent a significant gain in market power, as the acquiring airline's or alliance of airlines' power grows, its competitor's diminishes.

196.    Because of the resource constraints at Boston Logan, JFK, LaGuardia, and Newark, there are high barriers to entry for would-be new competitors, shoring up the market power of existing market participants.

197.    An airline or alliance of airlines with market power at Boston Logan, JFK, LaGuardia, and/or Newark has the power to restrict the availability of flights within the relevant market in at least three ways.

198.    First, an airline or alliance of airlines with market power in the relevant market may choose to fly fewer flights, leaving its designated resources such as gates and slots unused. This would reduce the number of planes available to fly willing passengers.

199.    Second, an airline or an alliance of airlines could fly smaller planes. Smaller planes have fewer seats, which means fewer passengers on each flight. This would reduce the number of passengers that could fit on the planes.

200.    Third, an alliance of airlines could coordinate their schedules—removing competing flights along the same route at roughly the same time on two or more airlines.

201.    An airline or an alliance of airlines that engages in one or more of these strategies—flying fewer planes, flying smaller planes, or de-duplicating a flight schedule with that of another airline—restricts the capacity at the affected airport. That is, it reduces the number of seats available to passengers, driving down supply.

202.    An airline or alliance of airlines with market power at Boston Logan, JFK, LaGuardia, and/or Newark could raise prices above competitive levels. Specifically, it can profitably affect a small but significant, non-transitory increase in the price for airfare within the relevant market without suffering a loss of airfare sales.

203.    Air travel moves people across long distances more quickly and efficiently than other modes of travel. For example, a flight from Boston to Washington, D.C. takes approximately one hour and forty-five minutes; whereas covering the same distance by train takes seven hours and thirty-eight minutes, by car can take up to nine hours, and by bus ten hours and forty-two minutes.

204.    Given the efficiency and time savings of air travel, not enough passengers would switch their travel plans from air travel to train, bus, or car in response to a small but significant, non-transitory increase in the price of airfare. Therefore, a hypothetical monopolist in the market for scheduled commercial air passenger service to, from, or through Boston Logan, JFK, LaGuardia, and/or Newark could profitably raise prices without losing business.

205.    Since air travel involves a set departure location and a set arrival location, passengers tend to pick departure airports near where they are located, and arrival airports near to their destination. Passengers would not want to travel to airports farther from their

locations to catch departing flights, nor arrive at airports remote from their intended destinations.

206.   For example, all or nearly all passengers who live in Newark, New Jersey would choose to fly out of Newark, rather than travel to Philadelphia before departing on a plane. And a passenger visiting Boston would choose to fly into Boston Logan, rather than fly to Manchester, NH, and then rent a car or travel by bus for an hour or an hour and a half to reach their final destination.

207.   For that reason, a small but significant, non-transitory increase in the price of airfare to, from, or through Boston Logan, JFK, LaGuardia, or Newark would not cause a meaningful number of would-be purchasers to abandon their intentions to travel to, from, or through those airports and instead fly to another regional airport.

208.   Passengers travelling to or from Boston do not view New Hampshire's Manchester-Boston Regional Airport or Rhode Island's T.F. Green International Airport as reasonable substitutes for flying into or out of Boston Logan. Therefore, not enough passengers would switch their travel plans from Boston Logan to Manchester or T.F. Green to avoid a small but significant, non-transitory price increase in airfare. Therefore, a hypothetical monopolist of scheduled air passenger service on a route to, from, or through Boston Logan likely would increase its prices by at least a small but significant and non-transitory amount.

209.   Passengers travelling to or from New York City do not view Newark as a reasonable substitute for flying into or out of LaGuardia or JFK. Not enough passengers would switch their travel plans from JFK or LaGuardia to Newark to avoid a small but significant, non-transitory price increase in airfare. Therefore, a hypothetical monopolist

of scheduled air passenger service on a route to and from JFK or LaGuardia likely would increase its prices by at least a small but significant and non-transitory amount.

210.    Conversely, as JetBlue itself has acknowledged, Newark attracts passengers to and from a different geographic area than the New York City airports. Not enough travelers to or from Newark would switch their travel plans to JFK or LaGuardia to avoid a small but significant, non-transitory price increase in airfare. Therefore, a hypothetical monopolist of scheduled air passenger service on a route to and from Newark likely would increase its prices by at least a small but significant and non-transitory amount.

211.    One of the routes most significantly impacted by the Northeast Alliance is the non-stop route between Boston Logan and Reagan in Washington, D.C.—a route dominated by JetBlue and American. Passengers traveling to or from Reagan do not view Dulles International Airport (Dulles) or Baltimore-Washington Thurgood Marshall International Airport (BWI) as reasonable substitutes for flying into Reagan. Not enough travelers to or from Reagan would switch their travel plans to Dulles or BWI to avoid a small but significant, non-transitory price increase in airfare. Therefore, a hypothetical monopolist of scheduled air passenger service on a route involving flights to and from Reagan likely would increase its prices by at least a small but significant and non-transitory amount.

## VI.    ANTICOMPETITIVE EFFECTS

212.    American and JetBlue, either individually or in concert with one another, willfully and unlawfully obtained and maintained their market power by conceiving, entering into, and executing the Northeast Alliance.

A.  **Before the Northeast Alliance, the defendants had significant market power at Boston Logan, JFK, LaGuardia, and Newark.**

213.  Prior to entering into the Northeast Alliance, both American and JetBlue had market power in the market for scheduled commercial passenger air travel. American was already the largest airline in the United States and the largest airline in the world. JetBlue was the sixth largest airline.

1.  **Boston Logan**

214.  JetBlue has been the largest presence at Boston Logan since 2010. It has more gates than any airline; provides the most ASMs of any airline; and, in 2019, enjoyed a 33% market share based on domestic traffic. During that same time, American has been the second- or third-largest presence at Boston Logan. It has the second most gates, second most peak travel time departures, and, by 2019, was tied with Delta as the second largest airline at Boston Logan when measured by ASMs. At the end of 2019, American enjoyed 19% of domestic air traffic at that airport.

215.  Before the Northeast Alliance, JetBlue served 40.7% of Boston Logan's local passengers, and American served 17%.

216.  The two companies competed vigorously for business to, from, or through Boston Logan. When JetBlue ran a sale reducing airfare between Boston Logan and airports in the Southeast U.S., American matched JetBlue's prices. When American expanded its low-cost offerings to the Southeast, JetBlue (and only JetBlue) matched American's offerings. When JetBlue lowered its fare for travel between Boston Logan and LaGuardia, American did too. As a result, average fares between those two airports dropped by 35% and passenger count increased by 41%. When JetBlue began offering flights between Boston Logan and Reagan National Airport, American dropped its prices

by 60%; as a result, average fares on that route dropped 29% overall, and passenger count increased by 73%.

217.    This is a prime example of the JetBlue Effect: prior to the Northeast Alliance, JetBlue's presence at Boston Logan led to decreased fare and increased traffic. This affected American acutely: flying into, out of, and through Boston Logan became less profitable when it was forced to compete with JetBlue—a phenomenon American cynically called "fare destruction," i.e., American's inability to overcharge customers. JetBlue's presence and activities at Boston Logan were a threat to American.

218.    But it was a boon to purchasers. Because, prior to the Northeast Alliance, there were three significant airlines competing in Boston (American, JetBlue, and Delta), there were more flights, and more seats available to passengers wanting to travel to, from, or through Boston Logan. And, because JetBlue and American were competing, prices were lower. JetBlue has estimated that it had saved Boston travelers more than $3 billion by 2019.

### 2. New York City

219.    In 2019, JetBlue was the third largest airline in New York City (i.e., JFK and LaGuardia) overall, within 19% of domestic traffic. When Newark is factored in, JetBlue remained a significant market presence, with 14.4% of domestic traffic. At JFK specifically, JetBlue was the largest airline; today it is the second largest. It holds the second most slots at JFK with 250 peak slots—approximately one quarter of all peak slots at that airport.

220.    American has also been a leader at the New York City airports. American exercised and capitalized on its market power by underutilizing its resources at New York

City in order to raise fares. Despite its gamesmanship with its resources, American was, in 2019, the second-largest airline in the city with 22% share of domestic traffic.

221.    Prior to the Northeast Alliance, American and JetBlue competed on price for routes to, from, and through the New York city airports—they routinely matched each other's progressively lower fares. For example, when JetBlue introduced Mint service in 2014, American significantly lowered its business-class fares on routes, like JFK-Los Angeles, that JetBlue served. As a result, American's refundable business-class fare on that route dropped from $4,009 to $2,313. When JetBlue announced a sale on regional flights including some from JFK, American matched its prices. When American expanded the scope of its sale to include additional routes, JetBlue followed suit.

222.    The JetBlue Effect at New York City airports cut into American's profit margins, but benefitted purchasers by ensuring lower fares, for more passengers, with better service at the New York City airports. Before JetBlue began operating at the New York City airports, JFK served 31.7 million passengers annually; after JetBlue's arrival, that figure grew to 62 million passengers in 2018. Fares on some routes fell by 75%. (Conversely, when JetBlue stopped flying one route out of New York City, fares on that route rose 75% and passenger count fell by 68%).

223.    Not only did JetBlue constrain American's pricing, American constrained JetBlue's pricing. On routes that JetBlue flew but American did not, JetBlue was able to profitably raise one-way fares by $20–$40.

**B.  Before the Northeast Alliance, American and JetBlue were ramping up competition at Boston Logan, JFK, LaGuardia, and Newark.**

224.    In 2019, less than one year before the Northeast Alliance sprung into being, both American and JetBlue were embroiled in intense, and escalating, competition.

225.   JetBlue intended to increase its daily departures in Boston from 176 flights to 200—a move it knew would force other airlines to add capacity and lower fares, benefitting purchasers. It planned to target, in particular, routes that American flew from Boston. It added more frequent Mint service from Boston to Los Angeles, which put significant pressure on American's business-class fare along that route. And it intended to offer hourly service between Boston and New York, Washington, D.C., and Philadelphia.

226.   American, for its part, resolved to resist JetBlue initiatives. It intended to increase its flights and the number of seats offered in 2020, and to offer 120 daily flights to, from, and through Boston by 2025. And it intended to enter new Boston-related routes served by JetBlue. In New York City, American intended to add 6,900 more flights and 1.7 million more seats in 2020, above and beyond its 2019 benchmarks. This included increasing its flights by 6.8% at JFK, and by 25.9% at LaGuardia. These moves by American would have forced JetBlue to lower its fares.

227.   Additionally, JetBlue's competitive presence in New York City was poised to remedy American's tactical underutilization of its slots at JFK. In 2019, prior to the Northeast Alliance, JetBlue and American had reached an agreement for JetBlue to lease 27 of American's slots at JFK. This would have increased the number of tickets available to passengers flying to, from, or through JFK, leading to increased output and decreased prices.

228.   And JetBlue also intended, prior to the Northeast Alliance, to introduce competition into flights from Boston Logan, JFK, LaGuardia, and Newark to the European continent by flying to London's Heathrow airport. Because JetBlue intended to offer tickets on those routes at fares lower than the legacy airlines, including American, this would have

disrupted the market for flights to London. When U.K. regulators investigated the anticompetitive effects of a joint venture between American and British Airways, it forced those airlines to divest several slots at Heathrow. JetBlue advocated mightily for those slots, promising U.S. and U.K. regulators that it could bring discipline to transatlantic fares to London if it were awarded those fares. JetBlue's entry into routes between the U.S. and London could be an existential threat to American. Just as JetBlue had done when it began offering Mint service on transcontinental flights, it would drive down fares (and therefore eat into American's profit margins) on transatlantic flights by as much as 50%–60%.

**C.  After the Northeast Alliance, JetBlue and American eliminated competition, leveraging their combined market power to raise prices.**

229.   Each of the agreements that formed the Northeast Alliance, both individually and in conjunction with other agreements between the company (or between American and Alaska), had anticompetitive effects on the market for scheduled commercial air passenger service to, from, and through Boston Logan, JFK, LaGuardia, and Newark. The below provides some examples of those effects.

230.   The Northeast Alliance Agreement and the Mutual Growth Incentive agreements ensured that the companies would not compete with each other for customers in the market for scheduled commercial air passenger service at Boston Logan, JFK, LaGuardia, and Newark. By entering into these agreements, JetBlue and American ensured that their interests were aligned, meaning they could make more money by coordinating on what routes to fly, with which size airplane, at what times, and how frequently. This ability meant that the defendants could collectively agree to reduce capacity and/or to raise prices, without American worrying about the JetBlue Effect, and without JetBlue having to worrying about a competitive response to its presence from American.

231.    The Northeast Alliance Agreement committed American and JetBlue to coordinate their schedules to ensure they were not competing with one another. The agreement euphemistically referred to this as "optimizing" the schedule. But under the agreement, the airlines only optimized the schedule for themselves, not purchasers. An optimized schedule for purchasers would have included many offerings, at many times, and head-to-head competition to drive down price. Instead, JetBlue and American colluded to de-duplicate their schedules so that they were not taking passengers away from each other, and to permit them to charge higher prices. For example: prior to the Northeast Alliance, American was planning to expand its offerings at LaGuardia by 25% in 2020. Instead, under the Northeast Alliance, it exited the busy, in-demand route between Boston and LaGuardia, cutting passenger choice along that route and driving up prices.

232.    The Northeast Alliance Agreement prohibited the defendants from selling their slot resources—a limited resource in New York City and Washington, D.C.—to any other airline. That agreement, together with their slot lease agreements, ensured that other airlines had only limited ability to compete against their newfound alliance—and could not do so by providing additional flights between Boston Logan, JFK, LaGuardia, and Newark, on the one hand, and slot-constrained airports on the other. This gave American and JetBlue the ability to affect a small but significant, non-transitory increase in the price of their airfare without losing sales—and in fact perhaps gaining sales.

233.    The Codeshare Agreement allowed both American and JetBlue to market to purchasers a network that was more expansive than they otherwise had separately. The increase in both companies' offerings was more than just additive. Not only could a passenger purchase a complete American itinerary from JetBlue; that purchaser could also

buy an itinerary in which one leg was flown on a JetBlue flight, while the next was flown on American. This gave JetBlue and American the ability to offer seemingly more complete and extensive networks to their customers than other airlines that did not have such an extensive codesharing program.

234.    The Codeshare Agreement was an especially valuable asset to American because, when combined with not just American's nationwide and international network, but also the code-shared offerings resulting from American's alliance with Alaska, it gained the ability to entice even more customers to book through, and pay increased prices to, American.

235.    The Codeshare Agreement gave American and JetBlue the ability to affect at least a small but significant, non-transitory increase without losing sales—and likely, instead, gaining sales.

236.    The Loyalty Program Agreements also gave American and JetBlue the ability to leverage their market power to increase their revenues within the market for scheduled domestic air service to, from, and through Boston Logan, JFK, LaGuardia, and Newark. The Loyalty Program Agreements empower American and JetBlue to profitably raise prices by a small but significant, non-transitory amount without losing customers, because it will attract more business customers to fly on Northeast Alliance routes. The Loyalty Program Agreement could result in $383 million in higher costs and price 2.7 million flyers out of the market.

237.    Another airline, Spirit, conducted its own analysis of the Northeast Alliance and estimated that it is likely the Northeast Alliance will increase fares in the range of 5% or more, with each 1% increase raising the cost to purchasers by approximately $80 million

per year. For each 1% increase in price, Spirit estimated that slightly more than half a million passengers will be lost, meaning the impact of the strategic partnership will negatively impact over 2.5 million passengers.

238.    The Northeast Alliance Agreement contained language acknowledging that it may be extended to JetBlue's transatlantic offerings, if JetBlue began offering flights between Boston Logan, JFK, LaGuardia, or Newark and the European continent. This depresses JetBlue's incentives—and stated intention—to enter those markets and compete on price.

239.    The Northeast *Alliance* did its job: it *aligned* American's and JetBlue's incentives, rewarding the companies for coordinating and punishing them for competing. This is the sort of horizontal market allocation that is condemned as *per se* illegal.

240.    Both the defendants are sophisticated airlines that understand well the interplay between capacity, scheduling, and pricing: that means that, by coordinating on which company would fly which route, using which plane, at what time, the defendants could coordinate predictable effects on price. American and JetBlue need not expressly discuss pricing to collude on price—a move prohibited by the antitrust laws.

241.    Not only that, before the Northeast Alliance, the defendants had incentives to compete to win business and revenue away from each other: American's gain was JetBlue's loss and JetBlue's gain was American's loss. After the Northeast Alliance, American's gain was JetBlue's gain, and JetBlue's gain was American's gain. Because the companies agreed to pool their incremental profits attributable to the Northeast Alliance, both companies knew that they could make more money by cooperating than by competing.

242.    The Northeast Alliance subverted prior measures previously taken by the DOT and the DOJ to try to maintain competition in the market for scheduled commercial air passenger service out of the Northeast. When American merged with US Airways, the DOT forced the newly-merged company to divest a number of slots, including many at Reagan which were then sold to JetBlue. Through the Northeast Alliance, American effectively regains control over those slots that the DOT and the DOJ already determined would allow American to wreak anticompetitive havoc on competition at Reagan.

243.    Following implementation of the Northeast Alliance, it is not credible to claim that JetBlue and American would continue to compete as aggressively as they had before the agreement. It is unrealistic to imagine that the defendants would compete on any route where their service overlapped.

244.    And effects of the Northeast Alliance on the market reach not only fares sold by American and JetBlue, but also the fares sold by other competitors. The Northeast Alliance effectively reduces the number of competitors by one on any route that was previously served by both defendants. If there were two competing companies (American and JetBlue) prior to the Northeast Alliance taking effect on a route (for example the non-stop Boston Logan-Reagan route, there was only one company after the Alliance. If there were three competitors on a route prior to the Alliance, after the Alliance there would be only two. Removing a competitor from a route—especially a competitor as aggressive as JetBlue, freed other airlines to raise their prices to more closely match the increased fares offered by the Northeast Alliance without losing sales.

245.    There are no procompetitive benefits from the Northeast Alliance that outweigh these anticompetitive effects. Any procompetitive benefits that may exist could

have been, and historically have been, achieved through means that did not have the same anticompetitive consequences.

246.    The so-called concessions that American and JetBlue made to the DOT before the DOT stayed its review of the Northeast Alliance in deference to the DOJ Complaint do not alleviate or mitigate these market effects. American and JetBlue agreed to make only a modest number of short-term slot leases available to other companies. But because those leases would be for only a limited time—and did not take effect until a year after the Northeast Alliance was implemented in February 2021—there is little incentive for other airlines to expend the time, money, and effort to develop a route using those slots, only to have to forfeit it after a few years. Not only that, the DOT agreement imposed only limited restraints on American and JetBlue's power to limit capacity at the New York airports: it required only a modest, 15% increase in capacity. None of American and JetBlue's divestitures touched Boston Logan, and nothing in the defendants' deal with the DOT required American and JetBlue to increase capacity at that airport. This leaves *all* the anticompetitive effects of the Northeast Alliance at Boston Logan intact.

247.    American and JetBlue's unlawful conduct deprived the plaintiff and members of the Class of the benefits of competition that the antitrust laws were designed to ensure.

### VII.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE

248.    During the Class Period, as defined below, the plaintiff and members of the Class purchased airfare directly from American, JetBlue, or their competitors. As a result of the defendants' anticompetitive conduct, the plaintiff and members of the Class were compelled to pay, and did pay, artificially inflated prices for airfare to, from, or through Boston Logan, JFK, LaGuardia, and/or Newark.

249.    Those prices were substantially higher than the prices the plaintiff and members of the Class would have paid absent the unlawful conduct alleged in this complaint because (1) the price of scheduled commercial airfare was artificially inflated by the defendants' illegal conduct; and (2) the purchasers were deprived of the opportunity to purchase equivalent, but lower-cost air travel, since the defendants' abuse of their market power caused prices to rise for all air travel to, from, or through the affected airports.

250.    As a result, the plaintiff and members of the Class have suffered damages in the form of overcharges. The exact quantum, form, and components of the damages suffered will be calculated after discovery and upon proof at trial.

251.    The defendants' efforts to monopolize the market for scheduled commercial air passenger service to, from, or through Boston Logan, JFK, LaGuardia, and Newark have substantially affected interstate and foreign commerce.

252.    At all material times, the defendants sold and provided scheduled commercial air passenger service in a continuous and uninterrupted flow of commerce across state lines and national lines and throughout the United States, including within this District.

253.    At all material times, the defendants transmitted funds as well as tickets, passenger information, invoices, payments, and other forms of business communications in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of scheduled commercial air passenger service to, from, or through Boston Logan, JFK, LaGuardia, and/or Newark.

254.    In furtherance of their efforts to monopolize and restrain competition in the relevant market, the defendants employed the U.S. mail and interstate and international

64

wire lines, as well as means of interstate and international travel. The defendants' activities were within the flow of and have substantially affected interstate commerce.

## VIII.   CLASS ACTION ALLEGATIONS

255.    The plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of herself and all others similarly situated as a representative of the Class, which is defined as follows:

> All persons or entities in the United States or its territories who purchased airfare for travel departing from, connecting through, or arriving at Boston Logan International Airport, John F. Kennedy International Airport, LaGuardia Airport, and Newark Liberty International Airport, directly from American Airlines Group, Inc.; JetBlue Airways Corp.; any other legacy carrier; any other low-cost carriers; and any of these companies' parents, affiliates, subsidiaries, predecessors, or successors during the time period beginning when the Northeast Alliance took effect in or about January 1, 2021 until the anticompetitive effects of the defendants' conduct ceases (the "Class Period").

Excluded from the Class are the defendants, any entity in which the defendants have controlling interest, and the defendants' current or former officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

256.    The plaintiff may alter the Class definition to conform to developments in the case and discovery.

257.    The Class is so numerous that joinder of all members in this Action is impracticable.

258.    JetBlue transported an estimated 30.1 million passengers in 2021 (the most recent calendar year for which the Bureau of Transportation Statistics has published complete data), including an estimated 3.3 million at Boston Logan; 5.1 million at JFK;

412,000 at LaGuardia, and 1.9 million at Newark, for a total of 10.7 million passengers at the four airports covered by the Northeast Alliance.

259.    American transported an estimated 116.2 million passengers in 2021, including 1.9 million at Boston Logan, 1.9 million at JFK, 1.5 million at LaGuardia, and 820,000 at Newark, for a total of 6.1 million passengers at the four airports covered by the Northeast Alliance.

260.    Because American and JetBlue's collusive Northeast Alliance caused fares to increase not just for their passengers but for passengers on all airlines flying into, out of, or through Boston Logan, JFK, LaGuardia, and Newark, the number of class members is larger still. In 2021, approximately 10.3 million passengers flew on domestic airlines through Boston Logan; approximately 12.5 million flew through JFK; approximately 7.7 million through LaGuardia; and approximately 13.8 through Newark.

261.    In total, then, more than 44.3 million passengers flew to, from, or through airports where JetBlue and American leveraged their ill-gotten market power obtained through the Northeast Alliance to raise the fares charged to those passengers.

262.    The precise number of class members is to be calculated in discovery, and identifiable from information and records in the defendants' and other airlines' possession.

263.    The plaintiff's claims are typical of those of the Class. Ms. Buehler and all members of the Class purchased airfare directly from American or JetBlue and were damaged by the same wrongful conduct by the defendants which resulted in the plaintiff and each of the Class members paying more for flights than they otherwise would have in a normal, competitive market. The plaintiff and members of the Class were forced to pay artificially inflated prices (overcharges) for airfare to or from the Northeast as a result of

the defendant's anticompetitive Northeast Alliance, and were deprived of the benefits of a competitive market because American and JetBlue agreed to cooperate to restrict capacity and raise prices, rather than to compete for purchasers.

264.    The plaintiff will fairly and adequately protect and represent the interests of the Class. Her claims are coincident with, and not antagonistic to, the interests of the Class.

265.    The plaintiff is represented by capable counsel with experience in litigating, and leading complex litigations involving, antitrust claims on behalf of purchasers.

266.    Questions of law and fact common to the Class predominate over questions which may affect only individual Class members because the defendants have acted on grounds generally applicable to the entire Class thereby making overcharge damages for the class as a whole appropriate.

267.    Common questions for the Class include, but are not limited to:

    a.    Whether American and JetBlue entered into the Northeast Alliance;

    b.    Whether, as members of the Northeast Alliance, the defendants opted to collude, rather than compete;

    c.    Whether the Northeast Alliance permitted, incentivized, or required the defendants to coordinate their flights into and out of Boston Logan, JFK, LaGuardia, and Newark airports;

    d.    Whether the defendants allocated or attempted to allocate the market for scheduled commercial air passenger service amongst themselves;

    e.    Whether the defendants coordinated their flights into and out of those airports by deciding jointly what size plane to fly, on what route, when, and by which defendant;

f.  Whether the defendants agreed, conspired, or colluded to set the prices of those flights above competitive levels;

g.  Whether the Northeast Alliance permitted, incentivized, or required the defendants to coordinate their flights in such a way that it had a predictable effect of raising the price of airfare on those flights, even in the absence of express communication about prices;

h.  Whether the defendants' joint decisions about what planes to fly, on what routes, when, and by which company had the effect of decreasing capacity (i.e., restricting output) into or out of Boston Logan, JFK, LaGuardia, and Newark Airports;

i.  Whether one or more of the agreements that formed the Northeast Alliance, standing alone or in conjunction with one or more other agreements reached by American and/or JetBlue, conferred market power on American and/or JetBlue;

j.  Whether one or more of the agreements that formed the Northeast Alliance, standing alone or in conjunction with one or more other agreements reached by American and/or JetBlue, had the effect of restricting output or raising prices for flights into or out of Boston Logan, JFK, LaGuardia, or Newark;

k.  Whether, by entering into the Northeast Alliance or any one or more of its subsidiary agreements, American reacquired control over slots at JFK or Reagan National Airport our routes throughout the country that the Department of Transportation, Department of Justice, or a court had

previously required American to cede control over to alleviate the anticompetitive effects of American's market position;

l.  Whether by entering into both the Northeast Alliance and the American-Alaska Alliance, American obtained, intended to obtain, and/or had a dangerous probability of obtaining, a monopoly in the relevant market;

m.  Whether the Mutual Growth Incentive Agreement permitted, incentivized, or obligated the defendants to restrict output, increase prices, and then share in the monopoly rents of their agreement;

n.  Whether the Northeast Alliance qualifies as a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress the supply of flights departing from or landing in the aforementioned airports, within the meaning of the Sherman Act;

o.  Whether the defendants, collectively, had market power in the relevant market;

p.  Whether, in negotiating, drafting, executing, and performing under the agreements that formed the Northeast Alliance, the defendants (whether individually or jointly) specifically intended to monopolize the relevant market;

q.  Whether, even if the defendants did not successfully together monopolize the market, they had a dangerous probability of succeeding at monopolizing the market (either individually or jointly);

r.  Whether the defendants' conduct, in entering into the Northeast Alliance, affects interstate commerce;

s.  Whether the defendants' conduct had anticompetitive effects on commerce;

t.  Whether the Northeast Alliance constitutes a horizontal market allocation deemed *per se* illegal under the Sherman Act;

u.  Whether any procompetitive justification for the defendants' anticompetitive conduct exists;

v.  If so, whether the restraint on trade inherent in the Northeast Alliance was reasonably necessary to accomplish those procompetitive justifications, or whether there exist less restrictive means to accomplish them;

w.  Whether the law requires definition of the relevant market when direct proof of market power exists and, if so, the definition of the relevant market;

x.  Whether and to what extent the defendants' conduct as alleged herein caused the Class to sustain overcharge damages; and

y.  The quantum of damages suffered by the Class.

268.  Class action treatment is a superior method for fairly and efficiently adjudicating this controversy. Such treatment will permit a large number of similarly situated individuals to resolve their common claims against the defendants simultaneously, efficiently; without the need to unnecessarily duplicate effort, evidence, or expense; and without the risk of inconsistent judgments entered by disparate courts nationwide. The injuries suffered by each individual member of the Class are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by the defendants' conduct. Absent a class action, it would be virtually impossible for individual

members of the Class to obtain effective relief from American and JetBlue. Even if Class members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

269.    The plaintiff and her counsel know of no special difficulty to be encountered in maintaining this case as a class action.

## IX.    CAUSES OF ACTION

### COUNT I
### Agreement in Restraint of Trade
### For Violation of § 1 of the Sherman Antitrust Act (15 U.S.C. 1)
### (Against All Defendants)

270.    The plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.    The defendants entered into the Northeast Alliance, which is a set of agreements. Among the agreements made as part of the Northeast Alliance were agreements to coordinate, rather than compete when scheduling air passenger service, deciding which routes each company would fly, and setting the capacity of those flights; to pool the excess revenue earned as a result of the Northeast Alliance, then share in those monopoly rents; to withhold the limited resources of slots and gates from competitors; and to "codeshare" in marketing their flights, making the two companies' products effectively one product.

71

272.    The Northeast Alliance qualifies as a contract, combination, and conspiracy within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1.

273.    Under the Northeast Alliance, American and JetBlue cooperate rather than compete. Because American and JetBlue no longer view themselves as competitors within the geographic scope of the Northeast Alliance, they have eliminated the head-to-head competition along routes to, from, and through the airports included in the Northeast Alliance that had previously increased capacity and decreased airfare. In other words, the defendants effectively removed one competitor from the already heavily consolidated market.

274.    This gives American and JetBlue the ability to raise prices above those that would be charged in a competitive market (i.e., in a market in which the two companies competed, rather than cooperated).

275.    The defendants collectively, therefore, have market power in the sale of scheduled commercial airline passenger service in the relevant market.

276.    The defendants did not acquire this power by offering a superior product, nor as a result of business acumen or historic accident. Rather they acquired this power by agreeing to allocate their substantial collective market share amongst themselves, in order to reduce capacity on flights to, from, and through Boston Logan, JFK, LaGuardia, and Newark airports.

277.    As a consequence of the defendants' coordination, they decided amongst themselves which airline would fly which route. Because American and JetBlue no longer view themselves as competitors within the geographic scope of the Northeast Alliance, they have eliminated the head-to-head competition along routes to and from the airports

included in the Northeast Alliance that had previously increased capacity and decreased airfare. For example, prior to the Northeast Alliance, the defendants competed rigorously for purchasers of airfare between Boston Logan and LaGuardia; after entering into the Northeast Alliance, American stopped flying that route, ceding it to JetBlue.

278.    By entering into the Northeast Alliance, the defendants have unreasonably restrained competition in the relevant market by allocating the market, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

279.    By removing a competitor from the market as a result of the Northeast Alliance, the defendants decreased the amount of available air passenger service—i.e., they restricted output by allocating the market amongst themselves.

280.    By restricting the output of the market, thus decreasing supply, the defendants were able to raise prices on scheduled commercial air passenger service to, from, and through Boston Logan, JFK, LaGuardia, and Newark.

281.    The Northeast Alliance brings substantial additional revenue to the defendants. For example in 2021, JetBlue achieved record revenues, despite the fact that American and JetBlue agreed to cut JetBlue's capacity by 10%.

282.    That excess revenue represents excess fares charged to purchasers, including the plaintiff and the Class.

283.    The restriction of output and increase in prices caused by the defendants' conduct as alleged in this Complaint thus affected not only passengers on JetBlue and American's planes, but *all* scheduled commercial air travelers' available choices and fares.

284.    By entering into the Northeast Alliance, the defendants have caused the plaintiff and members of the Class to pay supracompetitive prices for airline tickets to,

from, and through Boston Logan, LaGuardia, JFK, and Newark airports in the relevant market.

285.    Horizontal market allocations and or agreements to restrict output such as the Northeast Alliance are *per se* illegal.

286.    To the extent the Northeast Alliance is to be analyzed under a rule-of-reason analysis, no procompetitive justifications exist that outweigh the anticompetitive harm from the Alliance.

287.    Air passenger service, which carries customers across state lines and around the country and the world is a hallmark example of interstate commerce.

**COUNT II**
**Conspiracy to Monopolize**
**For Violation of § 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Against All Defendants)**

288.    The plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289.    The defendants entered into several agreements in furtherance of their Northeast Alliance.

290.    The Northeast Alliance qualifies as a contract, combination, and conspiracy within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1.

291.    Through the Northeast Alliance, the defendants conspired to obtain, maintain, and use monopoly power in the market for scheduled air passenger service.

292.    The goals and purposes of the Northeast Alliance was (1) to consolidate the defendants' market shares in order to control a commanding proportion of the market; (2) obtain and utilize the ability to restrict capacity by allocating various travel routes amongst

themselves; (3) raise prices for scheduled air passenger service along those routes; and then (4) split the monopoly rents between them.

293.   The defendants designed the Northeast Alliance to align their incentives towards inflated joint profits; constructed the Northeast Alliance Agreement to require coordinating routes, flight times, and plane sizes to maximize their profits at the expense of purchasers including the plaintiff and the Class; and included provisions that prevented either company from ceding the limited resources for growth to competing companies. This is evidence of their specific intent to accomplish anticompetitive ends.

294.   There is direct evidence that, through the Northeast Alliance, the defendants obtained monopoly power in the relevant market. This includes evidence that, after entering into the Northeast Alliance, American stopped flying along at least some routes on which it had previously competed with JetBlue.

295.   The defendants had the power to affect a small but significant, non-transitory increase in price in the relevant market. And they had the power to restrict output (i.e., capacity).

296.   The defendants did not acquire this power by offering a superior product, nor as a result of business acumen, nor historic accident. Rather they acquired this power by agreeing to allocate their substantial collective market share amongst themselves, in order to reduce capacity on flights to, from, and through Boston Logan, JFK, LaGuardia, and Newark airports.

297.   Instead, they acquired this power through their conspiracy that began with the Northeast Alliance. The conspiracy continues to this day. First, the defendants continue to perform under the agreements that form the Northeast Alliance. Second, upon

information and belief the defendants have collectively agreed to conceal the anticompetitive effects of the Northeast Alliance by not raising prices as much as they otherwise could or would while judicial review of their conduct is ongoing.

298.    By entering into the Northeast Alliance, the defendants have decreased capacity (output) and raised airfare (prices) along routes flown to, from, and through Boston Logan, JFK, LaGuardia, and Newark airports.

299.    Under the Northeast Alliance the defendants have agreed to pool their excess revenue earned through the Northeast Alliance, and then share that revenue.

300.    The Northeast Alliance caused substantial additional revenue for the companies. That excess revenue represents excess fares charged to purchasers, including the plaintiff and the Class.

301.    By entering into the Northeast Alliance, the defendants have caused the plaintiff and members of the Class to pay supracompetitive prices for airline tickets to, from, and through Boston Logan, LaGuardia, JFK, and Newark airports in the relevant market.

302.    The defendants' conduct alleged herein affects commercial air travel, a hallmark example of interstate commerce.

### COUNT III
### Attempted Monopolization
### For Violation of § 2 of the Sherman Antitrust Act (15 U.S.C. § 2)
### (Against American Airlines Group, Inc.)

303.    The plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

304.    In the alternative, the defendant American has engaged in anticompetitive, exclusionary conduct by entering into the Northeast Alliance.

76

305.    American entered into the Northeast Alliance with the specific intent to achieve monopoly power in the relevant market, as described above.

306.    Due to its significant market share, which includes not only the market power it wrongfully obtained through the Northeast Alliance, but also the power obtained through the interplay between the Northeast Alliance and American's joint venture with Alaska Airlines, American's conduct as set forth in this Complaint represents a dangerous probability of American successfully obtaining a monopoly position in the relevant market.

307.    American's anticompetitive, exclusionary conduct of entering into the Northeast Alliance constitutes attempted monopolization in violation of § 2 of the Sherman Antitrust Act.

308.    By entering into, and performing under, the Northeast Alliance; and by entering into, and performing under both the Northeast Alliance and the American-Alaska joint venture, the defendant American was able to reduce capacity (restrict output) and raise prices for scheduled commercial air passenger service in the relevant market.

309.    American's actions leading to restricted output and raised prices caused purchasers, like the plaintiff and members of the Class to pay supracompetitive prices for airline tickets to, from, and through Boston Logan, LaGuardia, JFK, and Newark airports in the relevant market.

310.    The plaintiff and members of the Class have been injured by American's attempt to monopolize the relevant market as alleged in this Complaint, in part, by paying supracompetitive prices for airline tickets to, from, or through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

**COUNT IV**
**Attempted Monopolization**
**For Violation of § 2 of the Sherman Antitrust Act (15 U.S.C. § 2)**
**(Against JetBlue)**

311.    The plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the paragraphs of this Complaint.

312.    JetBlue has engaged in anticompetitive, exclusionary conduct by entering into the Northeast Alliance.

313.    JetBlue entered into the Northeast Alliance with the specific intent to achieve monopoly power in the relevant market.

314.    Due to its significant market share, JetBlue's conduct as set forth in this Complaint constitutes a dangerous probability of JetBlue successfully obtaining a monopoly position in the relevant market through the anticompetitive, exclusionary conduct of entering into the Northeast Alliance.

315.    JetBlue's anticompetitive, exclusionary conduct of entering into the Northeast Alliance constitutes attempted monopolization in violation of § 2 of the Sherman Antitrust Act.

316.    The plaintiff and members of the Class have been injured by JetBlue's attempt to monopolize the relevant market as alleged in this Complaint, in part, by paying supracompetitive prices for airline tickets to, from, or through Boston Logan, LaGuardia, JFK, and Newark Liberty airports in the relevant market.

**X.    PRAYER FOR RELIEF**

317.    The plaintiff, on behalf of herself and members of the Class, respectfully requests judgment against the defendants as follows:

78

(a) Entry of an order certifying this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3), defining the Class as requested herein;

(b) Entry of an order appointing the plaintiff as representative of the Class;

(c) Entry of an order appointing the plaintiff's counsel as lead counsel for the Class;

(d) Entry of judgment against the defendants holding the unlawful contract, combination, or conspiracy alleged herein is in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2;

(e) Award to the plaintiff and members of the Class of damages, to the maximum extent allowed under the applicable laws, including entry of joint and several judgments in favor of the plaintiff and members of the Class against the defendants in an amount to be trebled to the extent such laws permit;

(f) Entry of an order permanently enjoining and restraining the defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act, on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(g) Entry of an order permanently enjoining and restraining the defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act, on their behalf or in concert with them, from in any matter continuing,

79

maintaining, or renewing the sharing of highly-sensitive competitive information that permits individual identification of company's information;

(h) Award to the plaintiff and members of the Class of pre- and post-judgment interest as provided by law, to be awarded at the highest legal rate from and after the date of service of this Complaint;

(i) Award of the plaintiff's reasonable litigation expenses and attorneys' fees to the extent allowed by law; and

(j) Grant of such other and further relief as the Court deems just and equitable.

## XI.    JURY TRIAL DEMAND

318.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the plaintiff demands a trial by jury on all issues so triable.

Dated: February 2, 2023                         Respectfully submitted,

*/s/ Steven L. Groopman*

**BERMAN TABACCO**

Kathleen M. Donovan-Maher (BBO #558947)
Steven L. Groopman (BBO #568933)
Kristie A. LaSalle (BBO #692891)
Christina L. Gregg (BBO #709220)
One Liberty Square
Boston, Massachusetts 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
kdonovanmaher@bermantabacco.com
sgroopman@bermantabacco.com
klasalle@bermantabacco.com
cgregg@bermantabacco.com

Todd A. Seaver (BBO #645874)
Matthew D. Pearson (*pro hac vice forthcoming*)

80

One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
tseaver@bermandetabacco.com
mpearson@bermantabacco.com

*Counsel for Plaintiff and the Proposed
Class*